# EXHIBIT "A"

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

_____

### I.      CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>Leif-Erik Hvide</u>
Plaintiff                                                    Case # _____
                                                             Judge  _____

vs.

<u>Holdun Family Office, LLC, Holt Financial, Ltd., Holdun Family Office (Bahamas) Limited, Holt</u>
<u>Accelerator Inc., Holt Accelerator, L.P., HOLT Funds SPC, Brendan Holt Dunn, Margaret Maggie</u>
<u>Dunphy, Stuart Dunn, Gordon Dempsey, Jan Christopher Arp, Michael A Blank</u>
 Defendant

_____

### II.      AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 – $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.      TYPE OF CASE        (If the case fits more than one type of case,   select the most
definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐ Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☐ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☐ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☐ Libel/Slander
      ☐ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

   12

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Jared Beck               Fla. Bar # 20695
       Attorney or party               (Bar # if attorney)

Jared Beck               02/28/2022
  (type or print name)            Date

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN
AND FOR MIAMI-DADE COUNTY,
FLORIDA

CIVIL DIVISION

CASE NO.:

LEIF-ERIK HVIDE,

Plaintiff,

vs.

HOLDUN FAMILY OFFICE, LLC;
HOLT FINANCIAL, LTD.; HOLDUN
FAMILY OFFICE (BAHAMAS)
LIMITED; HOLT ACCELERATOR INC.;
HOLT ACCELERATOR, L.P.; HOLT
FUNDS SPC; BRENDAN HOLT DUNN;
MARGARET "MAGGIE" DUNPHY;
STUART DUNN; JAN CHRISTOPHER
ARP; GORDON DEMPSEY; and
MICHAEL A. BLANK,

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, LEIF-ERIK HVIDE, ("Plaintiff"), hereby sues Defendants, HOLDUN FAMILY

OFFICE, LLC; HOLT FINANCIAL, LTD.; HOLDUN FAMILY OFFICE (BAHAMAS)

LIMITED; HOLT ACCELERATOR INC.; HOLT ACCELERATOR, L.P.; HOLT FUNDS SPC;

BRENDAN HOLT DUNN; MARGARET "MAGGIE" DUNPHY; STUART DUNN; JAN

CHRISTOPHER ARP; GORDON DEMPSEY; and MICHAEL A. BLANK, (collectively,

"Defendants"), and in support thereof, states as follows.

BECK & LEE

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

## INTRODUCTION

1.     This case is the story of how Plaintiff, a young business executive from South Florida, was systematically deceived, defrauded, extorted, and abused by a cast of characters and entities touting (and profiting from) their association with one of the wealthiest Canadians who ever lived.  As a result of the Defendants' heartless misdeeds, Plaintiff's finances and marriage were left in tatters.  This action is Plaintiff's attempt to obtain legal redress against his wrongdoers.

## JURISDICTION AND VENUE

2.     The amount in controversy exceeds the sum or value of $30,000, exclusive of interest, costs and attorneys' fees.

3.     Venue is proper in this County, which is where several of the Defendants reside and where a substantial part of the events and omissions that form the basis for Plaintiff's claims transpired.

## PARTIES

4.     Plaintiff, Leif-Erik Hvide, is a U.S. citizen residing in Rio de Janeiro, Brazil.

5.     Defendant, Holdun Family Office, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

6.     Defendant, Holt Financial, Ltd. is a Bahamian Corporation doing business in Miami-Dade County, Florida, with a principal place of business in The Bahamas.

7.     Defendant, Holdun Family Office (Bahamas) Limited is a Bahamian corporation doing business in Miami-Dade County, Florida.

8.     Defendant, Holt Accelerator Inc. is a Canadian corporation doing business in Miami-Dade County, Florida, with is principal place of business in Montreal, Canada.

9.      Defendant, Holt Accelerator, L.P. is a Canadian corporation doing business in Miami-Dade County, Florida.

10.     Defendant, HOLT Funds SPC is a Cayman Islands segregated portfolio company doing business in Florida and owning real property there through its affiliated companies.

11.     Defendant, Brendan Holt Dunn is an individual resident of The Bahamas.

12.     Defendant, Margaret ("Maggie") Dunphy is an individual resident of Montreal, Quebec, Canada.

13.     Defendant, Stuart Dunn is an individual resident of Montreal, Quebec, Canada.

14.     Defendant, Gordon Dempsey is an individual resident of Toronto, Ontario, Canada.

15.     Defendant, Jan Christopher Arp is an individual resident of Montreal, Quebec, Canada.

16.     Defendant Michael A. Blank is an individual resident of Miami-Dade County, Florida and a registered member of the Florida Bar who maintains a legal office in Miami-Dade County.

## FACTUAL BACKGROUND

**A.      Hvide Meets Brendan Holt Dunn in Miami, Beginning His Relationship with Brendan Dunn and the Holt Entities.**

14.     In the spring of 2018, Hvide was a full-time resident of Miami, Florida, living there with his wife and children.  At this time, Hvide was acting as a consultant for a company named Rokk3r Labs (Rokk3r is pronounced "rocker") and working on various projects in the digital finance space.

15.     One of these projects was a digital asset hedge fund named Rokk3r RAM, of which Hvide was the founding partner.

16.     Another project was a digital asset exchange startup for retail and institutional investors to trade and invest in digital tokens (e.g., Bitcoin).  Hvide had an innovative idea for this startup: to protect the exchange with a bank, which would act as a compliance gatekeeper to ensure full transparency, security, and compliance with securities laws.

17.     In May 2018, Jeffrey Ransdell, a business partner of Hvide's associated with a company called Rokk3r Fuel ExO, introduced Hvide to Brendan Holt Dunn, who agreed to meet Hvide in person to discuss investing in Hvide's hedge fund and exchange startup.

18.     Brendan Holt Dunn is a wealthy entrepreneur: a founder, CEO, and managing partner (among other roles) of various companies in several countries including Canada and the Bahamas.

19.     As has been advertised on the websites of several of Brendan Dunn's companies, he is the great-grandson of Sir Herbert Samuel Holt, a late-19th/early-20th century Canadian entrepreneur and former president of the Royal Bank of Canada (among other accomplishments and distinctions).  At the time of his death in 1941, the Montreal Gazette described Sir Holt as "the richest man in Canada."

20.     Brendan Dunn's businesses are for the most part family-run, closely held, and controlled by descendants of Sir Herbert Holt and their close relations and associates.  These businesses proudly boast, and tout the virtues, of being closely held and family run, and of the officers' and members' descendancy from Sir Herbert Holt.

21.     On May 24, 2018, Hvide and Brendan Dunn met in person together with Jeffrey Ransdell, at 1395 Brickell Avenue, Miami, Florida, in the restaurant of the Conrad Hotel, to discuss Hvide's business ideas – the hedge fund and exchange startup – and the possibility of Brendan Dunn investing in them.  Dunn was already in Miami on business to meet with Ransdell to

negotiate and finalize a partnership between Holt Accelerator and Ransdell's company Rokk3r Fuel ExO.

22.     Brendan Dunn agreed that he, through various entities, would fund Hvide's digital asset exchange if Hvide could meet again in a few weeks with a well-developed business presentation.  Brendan Dunn also agreed to invest in the Rokk3r RAM hedge fund.

23.     Brendan Dunn met Hvide again in Miami on June 5, 2018, in the Conrad Hotel's restaurant at 1395 Brickell Avenue, to review Hvide's business plan.  There, Brendan Dunn confirmed he would back Hvide's hedge fund and exchange startup through various entities.

24.     The digital asset exchange was incorporated on June 8, 2018, in The Bahamas, as "Digital Asset Management Limited."  The entity would operate under the d/b/a "Dunrok."

25.     On June 11, 2018, Brendan Dunn, writing from his e-mail address as CEO of Holdun Family Office (Bahamas), stated, "we are setting up the [digital asset exchange] company and bank account, so please proceed ASAP with starting the launch."

26.      During the following several months, Hvide continued to develop the Rokk3r RAM hedge fund and pushed Brendan to also assist in its opening, as Brendan Dunn had committed to do so.

27.     Although the hedge fund would ultimately be opened, as RAM Digital Asset Fund GP Ltd, Hvide was not given shares in it and was eventually guided to stop working on the hedge fund business, which he had proposed and helped create.

28.     Instead, Hvide was instructed to focus on Dunrok and other businesses and ventures associated with Brendan Dunn.  This would be the first of several instances where Hvide was cut off from ownership or involvement in a business or venture that he proposed or started and helped build.

**B.** **Hvide's Introduction to and Work for Other Holt Companies.**

29.     As Hvide began working with Brendan Dunn and working on Dunrok, Brendan Dunn introduced Hvide to his family and business associates with whom he ran and controlled various companies, including Stuart Dunn (Brendan's father), Peter Dunn (Brendan's uncle), Kat Dunn (Brendan's spouse), and Defendants Maggie Dunphy, Jan Arp, and Gordon Dempsey.

30.     One of these companies is Defendant Holt Accelerator, Inc.  As an "accelerator," Holt Accelerator provides capital, investments, services, and other support to startup financial technology (or "fintech") companies in exchange for a stake in the startup companies.

31.     Another one of the companies that Hvide was introduced to was Holdun Family Office, which provides wealth management and investment services, and is otherwise closely connected with Holt Accelerator and the other Holt companies.

32.     Hvide was also introduced to Carlos Ulloa and James Caprio who oversee the Holdun Income Fund, a Holt-affiliated private investment fund, and were developing the idea of a Holdun Real Estate Fund.

33.     As described more fully below, from the early stages of his relationship with Brendan Dunn, Hvide began performing substantial work for not only Dunrok, but also for Holt Accelerator, Holdun Family Office, the Holdun Income Fund, and the Holdun Real Estate Fund.

34.     Hvide worked for, or advised, several "Holt" companies ("Holt" companies is used herein for ease of discussion to refer to the various Brendan Dunn-affiliated companies for which Hvide worked), even though he was nominally employed by only one of them; this was consistent with how the various Holt companies operate.

35.     As of the commencement of this action, the websites of the companies touted the companies' interrelatedness – how they are family run and interconnected.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

36.     For example, the website of Holt Financial said, "Our combined legacy includes the Holdun Family Office and the Holt Accelerator, an AI and Fintech accelerator."

37.     The website of Holt Accelerator proclaimed it is "backed by Holdun" and "backed by the 5th Generation Family Office Holdun."  In describing Brendan Dunn, the Holt Accelerator website described him as "the CEO of *Holdun*, a 5th generation family business which offers family office services, wealth management services, trust services, corporate services, concierge services and financial services and was awarded best Multi-Family Office in the Caribbean 2017 for Holdun Family Office." (emphasis added).

38.     There are several "Holdun Family Office" entities and offices – including in Delaware, Canada, Florida, and the Bahamas.  But the Holdun Family Office website makes no distinction between them except to describe different locations.

39.     All of the Holt companies' websites touted the family legacy of Sir Herbert Holt, and the family-run nature of the business.

40.     As Hvide would later find out, Brendan Dunn and other prominent officers and directors of the various Holt companies acted on behalf of all of the companies as one large enterprise, making no apparent distinction between actions on behalf of one company as opposed to the other.

41.     Among other examples described herein, Brendan Dunn and other prominent officers and directors of the various Holt companies would use one company's e-mail address to conduct business on behalf of another company.

42.     Furthermore, on information and belief, some or all of these various companies intermingle their finances, either by operating out of one "wallet" that underwrites some or all of these enterprises, or by at least using the resources of one company to support another, regardless

B ECK  &  L EE
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

of domicile, participation by outside investors, shareholder obligations, or other conflicts of interest.

43.     Brendan Dunn or other prominent officers and directors of the various Holt companies would meet weekly over the phone or in person to have global strategy meetings, discussing and planning the business of all of the various Holt companies as one undifferentiated family enterprise.

44.     As Hvide became more involved, he would meet with various combinations of Brendan Dunn, Maggie Dunphy, Stuart Dunn, Gordon Dempsey, Jan Arp, and Florida residents Michael Blank, Carlos Ulloa, James Caprio, Timothy McCarthy, Marc Bonorino, Daniel Casanas and others at least once per month in Miami – a natural and convenient meeting point for officers and directors of the various Holt companies, who either lived in South Florida, or would come there for business given the numerous companies that they own and operate in the State and its proximity to the Bahamas, where Brendan Dunn maintains a home.

**C.     Hvide's Role as CEO of Digital Asset Management Limited (Dunrok).**

45.     From the beginning of his involvement with Dunrok, Hvide worked full-time in the Wynwood neighborhood of Miami, in a shared workspace rented by Rokk3r Fuel ExO, whose executives were also beneficiary owners of Dunrok (described below).

46.     Brendan Dunn and Hvide agreed Dunrok's ownership structure would be:

    a.   35% to Bally Crystal Investments Limited – which Brendan Dunn owned or controlled.

    b.   5% to Holdun Limited – on information and belief, a company associated with the Holt companies.

    c.   5% to Acacia Tree Holdings Limited – a holding company owned or controlled Kelly Nottage, an attorney who performs work for Brendan Dunn and various Holt entities.

    d.   45% to R3RAM, Ltd. – a Bahamian holding company whose shareholders were:

        i.   20% Hvide (equating to 9% of Dunrok)

        ii.   20% Jeffrey Ransdell

        iii.   20% Nabyl Charania

        iv.   20% German Montoya

        v.   20% Rokk3r Inc.

    e.   10% treasury for investors (it is from this pool that Brendan placed Holdun Opportunity Fund Limited for its investment in Dunrok).

47.    Among other responsibilities, Brendan Dunn directed the initial funding for the company, in an amount of $457,500.00, to come from Holdun Opportunity Fund, Ltd. – a Bahamian investment fund with which Brendan Dunn is associated.

48.    Holt entities continued to fund Dunrok's operation over the subsequent months through investments by Holdun Opportunity Fund ($1,000,000.00 total) and Holdun Investments Inc. ($500,000.00).

49.    Brendan Dunn agreed on July 24, 2018 that Hvide would be Dunrok's CEO.

50.    After Hvide's appointment to the position of CEO:

    a.   Brendan Dunn appointed his controller, Gordon Dempsey, a Canadian national, as CFO for Dunrok in August 2018.

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

    b.   On Hvide's recommendation, Daniel Casanas (a U.S. citizen and Miami resident) was brought onboard as COO in August 2018.

51.    Through the efforts of an executive recruiter hired by Dunrok:

    a.   Marc Bonorino (a U.S. Citizen) was hired as chief compliance officer (CCO) in September 2018.  Bonorino moved from Virginia to Miami for this position.

    b.   Bomi Song (a U.S. Citizen and New Jersey resident) was hired as chief marketing officer (CMO) in November 2018 and began working from the Miami office.

52.    In August 2018, CFO Gordon Dempsey traveled from Canada to Miami to meet with Hvide and his team.  Dempsey continued to come to Miami at least monthly thereafter. During these meetings, Dunrok's financials were developed and discussed, presentations were made to potential investors, and other critical strategic and business decisions were made for Dunrok.

53.    As CEO, Hvide was responsible for leading the development and execution of Dunrok's long-term strategy with a view to creating shareholder value.  He was also responsible for day-to-day management decisions and for implementing Dunrok's long- and short-term plans. Hvide acted as a direct liaison between Dunrok's board of directors and management, communicating to the board on behalf of management. Hvide also communicated on behalf of Dunrok to shareholders, employees, government authorities, other stakeholders, and the public, and developed advantageous business relationships with those individuals and entities.

54.    Hvide, as the founder and initially CEO of the company, was a key part of the "nerve center" of the company: he created the business plan, spearheaded development of all

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

aspects of company's software development, led fundraising efforts, led human resources hires, and guided the corporate strategy.

55.     Hvide's progress was measured and updated to the teams at Rokk3r Labs, Rokk3r Fuel ExO, and Dunrok (as well as other individuals associated with Brendan Dunn and Holt entities) on a twice-weekly basis through scheduled conference calls and board meetings.  Often physically present in Miami at these meetings were:

    a.  Hvide (CEO).

    b.  Daniel Casanas (COO, Miami resident).

    c.  Marc Bonorino (CCO, Miami resident).

    d.  Bomi Song (CMO, working from Miami).

    e.  Gordon Dempsey (CFO, Canadian resident).

    f.  Nabyl Charania (Shareholder/Director, Canadian, Miami resident).

    g.  Jeffrey Ransdell (Shareholder/Director, Miami resident).

    h.  German Montoya (Shareholder/Director, Miami resident).

56.     Often dialing in remotely to these calls, from The Bahamas and Canada, were:

    a.  Brendan Dunn (Shareholder/Director).

    b.  Maggie Dunphy (Shareholder/Director).

    c.  Stuart Dunn (Shareholder).

57.     A Dunrok executive strategy meeting was held in person on September 1, 2018, at the conference room of the Sheraton Cypress Creek in Ft. Lauderdale.  Present at that meeting were Brendan Dunn, Stuart Dunn, Hvide, Jeffrey Ransdell, Gordon Dempsey, and Nabyl Charania.

58.     During one of the team conference calls, with Hvide, Bonorino, Casanas, Dempsey, Brendan Dunn, Maggie Dunphy, and Jeff Ransdell present, Marc Bonorino informed the

defendants that if the nerve center of the management team continued to operate out of a Florida office and be paid in Florida, that the company and its stakeholders and directors might be exposed to litigation in the State of Florida.

59.     After this meeting, Brendan Dunn decided Bonorino, Casanas, and Hvide should be relocated to The Bahamas to preserve Bahamian jurisdiction for Dunrok and be closer to Brendan Dunn and his offices at Albany Financial Center.

60.     Brendan Dunn invited Bonorino, Casanas, and Hvide to come to Nassau (The Bahamas) at the end of September 2018, on an expatriation exploration trip.  For Hvide, the trip was in part to make his wife and children comfortable with the idea of uprooting the family from Miami and moving to The Bahamas.   Brendan Dunn told Hvide he would "take care of everything," which ended up involving accommodations, tours of schools for Hvide's children, tours of homes for Hvide and his family to live in, and a welcoming barbeque at Brendan Dunn's home to meet his wife and children.

61.     Hvide traveled with his family to Nassau during the first week of October 2019, and they were put up in a hotel at the Baha Mar, which was arranged by Brendan Dunn.

62.     Hvide attended business meetings during this Bahamas trip as well, including with Brendan Dunn, Gordon Dempsey, Maggie Dunphy, Marc Bonorino, and Daniel Casanas, concerning Dunrok.  Again Bonorino reiterated numerous times the importance of moving the office and the management team to The Bahamas.

63.     Throughout the trip, Hvide paid for his trip out of pocket and at the end of the stay was presented with a bill for accommodations.

64.     Hvide sent in an expense report for this relocation trip to Gordon Dempsey, but Gordon Dempsey refused to reimburse Hvide for these expenses, instead stating they were Hvide's

B E C K  &  L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

responsibility.  This would be the first of many times that Holt through Gordon Dempsey would either refuse to pay Hvide's invoices, delay them unreasonably, or pay only partial amounts.

65.     In November 2018, Brendan Dunn began taking certain actions, which, on information and belief, were designed to consolidate control over Dunrok.

66.     In a meeting with Gordon Dempsey, Bonorino, Casanas, and Hvide in Miami, and with Brendan Dunn and Maggie Dunphy appearing via teleconference, Dunn, Dempsey, and Dunphy advised the management team that they wanted to devise a plan to remove Rokk3r shareholders from the Company and appropriate their shares.  Bonorino informed them that it was not possible to appropriate shares without giving just consideration.

67.     During a telephonic board meeting on November 9, 2018, Brendan Dunn proposed that Marc Bonorino would stop being a Dunrok employee, but would become an employee of Holdun Bahamas and leased to Dunrok.  At this time, Hvide and Dunrok's executive team were still intending to move to The Bahamas.

68.     During a telephonic board meeting on November 16, 2018, the board approved Marc Bonorino to become the CCO for both Holdun and Dunrok.

69.     Mr. Bonorino, as CLO for Holdun, was tasked with investigating Rokk3r's participation in Dunrok.

70.     On November 23, 2018, during a telephonic board of directors meeting, it was resolved that the then-current Board of Directors – which included Brendan Dunn as Chairman and Jeff Ransdell as Director – would be revised to include Stuart Dunn, Maggie Dunphy, Gordon Dempsey, Hvide, and Nabyl Charania.  This change put the balance of control of the board of directors in Brendan Dunn's hands as four of the members were either related to Brendan Dunn or

were officers or directors of Holt entities, two of the members were executives of Rokk3r Fuel ExO, and Hvide was the CEO.

71.     During this time, it was proposed by Brendan that for compliance reasons, Nabyl Charania, Jeff Ransdell, and German Montoya could not be shareholders of Dunrok and thus, R3Ram, Ltd. should be removed from the shareholder registry and the shares redistributed.

72.     On December 10, R3RAM, Ltd. was removed from the shareholder list and shares in Dunrok were re-distributed as follows:

    a.   1,777 shares (35.5% of the equity) issued to Bally Crystal Investments Limited, Brendan Dunn's holding company.

    b.   90 shares (1.8% of the equity) issued to Acacia Tree Holdings Limited, Kelly Nottage's holding company.

    c.   68 shares (1.4% of the equity) issued to Margaret Dunphy.

    d.   68 shares (1.4% of the equity) issued to Gordon Dempsey.

    e.   22 shares (0.4% of the equity) issued to Spyder Whitney, a holding company of Brendan Dunn's brother Whitney Dunn.

    f.   1,224 shares (24.5% of the equity) issued to a new holding company, Digital Asset Holdings, which based on information and belief, is owned or controlled by Brendan Dunn.

    g.   405 shares (8.1% of the equity) issued to DRK MGMT Limited, a new holding company that Hvide was instructed by Brendan to open using Kelly Nottage as his agent.  This change represented a share reduction to Hvide of 10%, or 45 shares from his share ownership via R3RAM, Ltd. which owned 2,250 shares of which 20% (450 shares) were owned by Hvide.

h.   351 shares (7.0% of the equity) issued to Rokk3r Inc.

i.   45 shares (0.9% of the equity) issued to Rokk3r Fuel.

j.   100 shares (2.0% of the equity) were sold to Holdun Opportunity Fund for $1,000,000.00 ($10,000/share).

k.   50 shares (1.0% of the equity) were sold to Holdun Investments Inc. for $500,000.00 ($10,000/share).

l.   4,200 shares were issued in Digital Asset Management, with an additional 800 shares in treasury for a total of 5,000 shares, giving the company a total market value of $50,000,000.00.

73.   As a result, Brendan Dunn, through two companies, Bally Crystal and Digital Asset Holdings, owned 60% of Dunrok and together with Whitney, Nottage, Dunphy, Dempsey, the Holdun Opportunity Fund, and Holdun Investments Inc., controlled a supermajority of the company.

74.   In December 2018, Brendan Dunn explained to the management team that they would not be moving to The Bahamas because that it would be expensive.

75.   Around this time, Bonorino disagreed vehemently, contending that such a decision exposed the company, including its directors, shareholders, and management to unnecessary risk and could subject the parties to Florida jurisdiction in the event of litigation.  Brendan Dunn communicated to the team that management was given share ownership in the company to compensate for this risk, which did not fall on him personally.  Consequently, and against Bonorino's and management's recommendations, Hvide, Marc Bonorino, and Daniel Casanas were moved to an office at 1395 Brickell Avenue, Suite 900, an office which was paid for and maintained by Holdun, dating back to at least 2013.

B E C K  &  L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

76.     At the beginning of December 2018, subscription agreements went out to Rokk3r Fuel, Holdun Opportunity Fund, and Holdun Investments Inc.

77.     Rokk3r Fuel subscribed for $1 million, Holdun Opportunity Fund subscribed for $1 million, and Holdun Investments Inc. subscribed for $500,000.

78.     As head of compliance, Marc Bonorino was tasked with a compliance review of the equity investments in Dunrok.

79.     In December 2018, Rokk3r Fuel ExO's first capital investment into Dunrok, which had been wired from Rokk3r Fuel, ExO to Digital Asset Management's account in The Bahamas, was rejected for compliance reasons and returned to Rokk3r.

80.     At the same time, investments from Holdun Opportunity Fund Ltd. and Holdun Investments Inc. for $1 million and $500,000 were approved and accepted. These investments validated the company valuation of $50 million, with a purchase price of $100/share. This established a value for Hvide's shares in Dunrok of approximately $4 million.

81.     By the end of December 2018, Hvide, Rokk3r, and his team had achieved its goals and had prepared Dunrok for a market launch:

  a.  As of December 12, 2018, the marketing plan developed by Hvide, Bomi Song, and a Miami-based marketing agency was ready to launch in January 2019 with a press release, a public relations tour of Asia, website, and marketing materials.

  b.  As of December 17, 2018, a software platform that had been developed by Hvide, Rokk3r, and a third-party software development company was in the final stages of beta testing and was ready for public release to markets in Asia and Australia in January.

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

    c.   After months of negotiations and a trip to Los Angeles to meet with their CEO, Marc Wade, Hvide signed a cross-marketing and cross-investment agreement with a stock trading app company in California called White Shark, which was projected to provide Dunrok with at least 100,000 clients.

    d.   Using standard industry metrics for digital banking valuations of approximately $1,000/client, this agreement together with Dunrok's readiness to launch boosted the value of Dunrok to over $100 million.

    e.   Hvide and his team had also lined up investors for a subsequent equity raise at this $100 million level, which included Marc Wade and other third-party investors.

82.    Following the compliance rejection of Rokk3r's investment, Hvide, Marc Bonorino and Daniel Casanas mapped out potential paths forward, and suggested continuing to operate Dunrok, buy out the shareholders of Rokk3r Inc. and Rokk3r Fuel ExO in order to regain full control over the software codebase, and launch the company to the public in February 2019.

83.    On information and belief, including facts alleged below, Brendan Dunn, Maggie Dunphy, Stuart Dunn, and Gordon Dempsey met during the end of December and/or the beginning of January and decided to dissolve Dunrok, reconstitute the company under a new name, Holt Financial, and conspired to remove equity from persons and companies not affiliated with the Dunn family or Holt entities.

84.    On January 11, 2019, after he had achieved majority control, Brendan pushed through a resolution to allow Digital Asset Management through a simple majority vote (Brendan) to wind up the company without the consent of any other shareholders or directors.  Hvide was

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

coerced by Brendan into signing this document in order to demonstrate his loyalty to the family and maintain his position and benefits.

85.     This resolution would have passed whether Hvide signed it or not, insofar as it provided that "[a]t least three of the four shareholders are to sign this written consent for same to be valid."

**D.   Dunrok is Changed to Holt Financial, Ltd.; Hvide's Status and Shares are Diminished**.

86.     In January 2019, Hvide was told by Daniel Casanas that the decision was made to:

    a.   Dissolve Dunrok and reconstitute it as "Holt Financial, Ltd."

    b.   Diminish Hvide's status and salary.

    c.   Remove Hvide as CEO, giving him the title of "Global Head of Strategy."

    d.   Reduce Hvide's shares from 8.1% to 4%.

    e.   Not pay Hvide his accrued, unpaid, and in arrears salary for the previous two months.

87.     Holt Financial is a mere continuation of Dunrok, because not only did Holt Financial absorb almost all of Dunrok's employees, but also its assets, liabilities, and stockholders, and continued to operate out of the same offices.

88.     Holt Financial assumed the same employees as Dunrok:

    a.   Chairman: Same, Brendan Dunn (Bahamas).

    b.   CEO: Formerly Hvide (Florida) became Brendan Dunn.

    c.   Global Head of Strategy: previously none, became Hvide (Florida).

    d.   COO: Same: Daniel Casanas (Florida).

    e.   CCO: Same, Marc Bonorino (Florida).

    f.   CMO: Bomi Song (working from Floria), replaced by Hallie Janson (Florida).

g.  CFO: Same, Gordon Dempsey (Canada).

h.  Analyst: Same, Addison Dempsey (Canada/Florida).

i.  Bahamas Counsel: Same, Kelly Nottage.

j.  Florida Counsel: Same, Cullin O'Brien, Esq.

89.    Hvide, as the founder and initially CEO of Dunrok, was a key part of the management of the company.  He created the business plan, spearheaded development of all aspects of company's software development, led fundraising efforts, led human resources hires, and guided the corporate strategy.

90.    Hvide's work for Holt Financial, as with Dunrok, was performed from offices maintained by the defendants in Florida and he was paid for his services into his Florida bank account from a U.S. bank account maintained by Holt Financial.

91.    Similarly, although Dunn became the CEO, his level of involvement remained the same.  While always retaining authority to make decisions, the management and central operations of Holt Financial, as when it was Dunrok, were carried out by the company's key personnel in Miami.  Dunn was the only officer or employee of Dunrok/Holt Financial who maintained residency in The Bahamas.

92.    Holt Financial assumed the same assets as Dunrok:

a.  Holt Financial assumed all assets of Dunrok, including but not limited to: contracts with 3rd party service providers, a banking software platform licensed by Aerapass, a currency exchange trading software platform licensed from Modulus, a trader ranking software platform developed by Fundseeder (a Florida corporation), and equity ownership in Fundseeder.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

b.  Holt Financial also went so far as to assume and pay liabilities of Dunrok, including prominently its account payable with Havas marketing company of Miami, Florida, and its account payable with Rokk3r Labs of Miami, Florida. Part of Havas' marketing team in Florida (itself a Florida company, owned and operated by Hallie Jansen) was retained by the Defendants and paid in Florida for marketing it performed for the Defendants.

93.     Holt Financial assumed the same stockholders as Dunrok.  Except as described previously with the adjustment of Hvide's share ownership and the assumption of Rokk3r shares by the Defendants, the shareholders were the same after the name change.

94.     Holt Financial assumed the same offices as Dunrok.  Florida employees of Dunrok operated out of 1395 Brickell Avenue Suite 900, and continued to do so after the continuation to Holt Financial.  Holdun Family Offices in The Bahamas continued to be used as the address of record for Holt Financial, as they were for Dunrok.

95.     As noted, the actual nerve center for Dunrok, and then Holt Financial, was where its management team lived and operated from on a regular basis: Miami, Florida.  The vast majority of in-person meetings involved Dunn, Dunphy, and Dempsey traveling to Miami to meet with the management team instead of the management team traveling to The Bahamas to meet with Dunn.

96.     Although Dunrok/Holt Financial's headquarters of record are listed as Albany Center, The Bahamas, in practice that office was maintained and staffed by Holdun Family Office, Ltd.

97.     Hvide was not given any explanation or reasoning for the reduction in his position and benefits.  Brendan Dunn refused to speak with Hvide directly about it and directed all questions to Daniel Casanas.

B E C K  &  L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

98.     Hvide was informed that he should be grateful that he got to keep any equity at all and still had a job and health insurance because Brendan Dunn and the Holt companies decided to keep Hvide onboard as a shareholder and employee only out of the kindness of their hearts and the understanding that Hvide would develop the Holdun Real Estate Fund and other new opportunities for Brendan Dunn and the Holt entities.

99.     By placing Hvide into a tenuous financial and personal position and threatening him with dismissal and termination of healthcare, Hvide was unable to contest these adverse actions and was forced to accept them.

100.    At the time that it was decided to dissolve and reconstitute Dunrok as Holt Financial, Hvide's 8.1% shares had a market value of $8,100,000.00.

101.    Hvide incurred substantial late fees, interest, and penalties from his mortgage lender and credit card companies.  Eventually, Hvide would default on his mortgage with a foreclosure filing on his family's home.

102.    Thus, similar to how certain of the defendants made commitments to Hvide and claimed to be "partnering" with him to develop the RAM Digital Asset Fund, only to be cut off, these defendants made promises to Hvide and claimed to be partnering with him, to get him to fully develop Dunrok, only to constrain him financially and cut him out, once the lion's share of the work had been performed.

E.      **Hvide Continues to Work for Holt Entities.**

103.    After the dissolution of Dunrok, and as Global Head of Strategy, Hvide continued to work out of the office at 1395 Brickell Ave and was given keys and a keycard to that office for his use whenever he was in Miami.

104.    Just as when he was CEO of Holt Financial, now that he was Global Head of Strategy, Hvide continued to work for Holt Financial, Holdun Family Office, Holt Accelerator, and Holdun Real Estate Fund.  Hvide was given e-mail addresses for Holt Accelerator, Holt Financial, and Holdun Family Office.

105.    For example, on March 25, 2019, at a conference room in the Hampton Inn, two blocks from 1395 Brickell in Miami, Florida, various officers and directors of Holt entities held a "Holt Executive Meeting."

106.    The attendees included Brendan Dunn, Margaret Dunphy, Jan Arp, Marc Bonorino, Daniel Casanas, Carlos Ulloa, Gordon Dempsey, Michael Blank, and Hvide, and various other officers and directors of Holt entities.

107.    The attendees discussed comprehensive plans for the integration and collaboration of all of the Holt companies, including Holdun Family Office, Holt Financial, and Holt Accelerator, Inc.  During this meeting, it was decided that a conference call would take place with the attendees of this meeting every Friday morning thereafter to review the status and strategies of the Holt companies.

108.    Meanwhile, in or about January 2019, Holdun Family Office incorporated a Florida LLC called Holdun Family Office, LLC and opened an office in Miami.  This was reported as an "expansion" of the various Holdun Family Office entities into Miami.  This entity is a Licensed Florida Registered Investment Advisor (RIA), offering wealth management services to Florida residents.  Management of this company included Brendan Dunn, CEO, Michael Blank, President, and Giuseppe Mazzeo, CIO. The controlling shareholders of this Florida company, which earns fees from Florida clients, are Brendan Dunn, Maggie Dunphy, and Marc Bonorino. This was also the fruit of a business idea that Hvide proposed to Brendan Dunn back in the summer of 2018 –

B E C K   &   L E E

8 3 0 6   M i l l s   D r i v e ,   # 2 4 8   |   M i a m i ,   F l o r i d a   3 3 1 8 3   |   3 0 5 - 2 3 4 - 2 0 6 0

another business opportunity that Hvide brought to Holt and helped develop and in which he was not included or compensated for. Hvide worked to assist Michael Blank in conceptualizing and developing this expansion of the Holdun Family Office into Miami, which led to the creation of Holdun Family Office LLC along with Blank's executive and shareholding role there. Hvide was never compensated for providing any of these benefits.

109.     Throughout the first half of 2019, Hvide was instructed by Brendan Dunn to attend various prospective client meetings with Michael Blank and to make various client contacts to assist in the growth of Holdun Family Office in Miami well as to foster the interrelatedness of Holdun Family Office with Holt Financial and Holt Accelerator and vice versa.

110.     These Florida client meetings included:

   a.   Stemtech Corporation of Miramar, Florida, together with Michael Blank and Daniel Casanas, to discuss how Holt Financial and Holdun could assist in their fundraising efforts.

   b.    An e-mail exchange with Douglass S. Lodmell – a Miami attorney and Michael Blank's largest source of referral clients – regarding how Holt Financial's platform can benefit their clients.

   c.   Multiple meetings with Luiz Barbosa of Prudent Group located on Brickell Avenue in Miami, Florida, together with Michael Blank, Marc Bonorino, and Daniel Casanas.

   d.   Antonio Maciel of Optimal Capital Partners in Miami, Florida, together with Michael Blank, Marc Bonorino, and Daniel Casanas, to market Holt Financial to Maciel's clients.

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

111.    In addition to client meetings, Hvide also attended Holdun conference calls together with Michael Blank in his office and spent many hours working through corporate development opportunities as well as a meeting at the Hampton Inn on Brickell together with Michael Blank, Marc Bonorino, and Maggie Dunphy.

**F.    Hvide's Work For Holdun Real Estate Fund.**

112.    After Dunrok was dissolved, when Hvide was informed of his reduction in status and revised role with Holt, Hvide was offered the opportunity to take over development of the Holdun Real Estate Fund.

113.    Hvide had been working on the Holdun Real Estate Fund since the summer of 2018 with Carlos Ulloa and James Caprio, who ran the Holdun Income Fund and were looking into the idea of a commercial real estate fund for Holdun.

114.    Hvide was asked to assist on this project as he had previous experience launching and running a real estate fund.  Brendan promised by teleconference (the call was held at 1395 Brickell Ave together with Marc Bonorino and Carlos Ulloa who were also physically present with Hvide) that Hvide would receive equity participation in the fund.

115.    Hvide had previously prepared a proposal for the fund, which was completed and delivered in August 2018.

116.    Now, in the aftermath of Dunrok's dissolution and Hvide's reduction in salary and status, Hvide was tasked with preparing and delivering the first draft of the offering memorandum for the Holdun Real Estate Fund.

117.    In a February 26, 2019 e-mail, Dunn, writing from his Holdun e-mail address, expressly acknowledged Hvide's work for Holdun and introduced Hvide as "head of our advisory team."

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

118.    Throughout February 2019, Hvide continued to work with Carlos Ulloa, James Caprio,[1] and Marc Bonorino in South Florida, mostly at the 1395 Brickell office, to further develop the fund, assist with investor presentations, and strategize the fundraising.

119.    Hvide's work on the Real Estate Fund included redrafting the prospectus using Cayman law, based on Hvide's idea to move the fund's domicile from The Bahamas to The Cayman Islands because The Cayman Islands offered an umbrella fund structure (segregated portfolio company, or "SPC") that would be cost effective for opening additional funds in the future.

120.    On February 27, 2019, Phil Stewart, Senior Vice President of Holdun Family Office (Cayman) Limited, asked Brendan Dunn for an update on the real estate fund.  Brendan Dunn copied Hvide on his reply to Phil Stewart, that in reference to the Holdun Real Estate Fund, "Leif is the boss of this."

121.    During the months of March and April, 2019, Hvide continued to work with Ulloa and Caprio on the fund as well as Phil Stewart on capital raising efforts.

122.    In early March 2019, a Cayman law firm was retained to formalize and incorporate the fund.  They provided a detailed questionnaire to get started on this process and Hvide was tasked with completing it.

123.    On March 14, 2019, Gordon Dempsey refused to pay Hvide's expense report and Hvide was forced to go to Brendan Dunn to get this resolved.

---

[1]     James Caprio was described, in a recommendation letter from Dunn, as having significant responsibilities and contributing significant work in furtherance of the Holdun Income Fund and Holdun Opportunity Fund.  He was also described as being an integral part of the Holdun Commercial Real Estate Fund.

B E C K  &  L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

124.    On March 20, 2019, Hvide delivered the draft prospectus and completed the fund questionnaire.

125.    After delivering the prospectus and questionnaire, Hvide was excluded from further development of the fund, and was given only vague explanations to the effect that he would be "taken care of," on the understanding that he continued to work on various other projects for the Holt entities and family.

126.    On March 27, 2019, Gordon Dempsey again refused to pay Hvide's expense report and Hvide was forced to go to Brendan Dunn to get this resolved.

127.    Furthermore, from February through May 2019, Holt arbitrarily and without explanation refused to pay Hvide's travel expenses of more than $4,000 during any calendar month.  By May 15, 2019, these accrued unpaid expenses totaled $4,470.28, which Hvide had to pay out of pocket, further exacerbating Hvide's personal financial situation, marriage, and his physical and emotional health.

128.    Holdun Real Estate Fund was opened in August 2019 as HOLT Funds, SPC and Hvide was not given participation or recognition in the fund despite Brendan Dunn's prior representations.

129.    Hvide's exclusion from the Holdun Real Estate Fund is yet another example where Hvide proceeded in good faith based on representations by Brendan Dunn and other defendants to develop a business opportunity for the Holt entities and family, who then constrained him financially, and cut him out of the deal once the lion's share of the work had been performed.

**G.    Hvide's Work for Holt Accelerator.**

130.    As previously mentioned, one of the Holt companies Hvide worked for from the early stages of his relationship with Brendan Dunn was Holt Accelerator.

B E C K   &   L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

131.    On June 8, 2018, Brendan Dunn assigned Hvide to be Holt Accelerator's representative and to be a speaker at a fintech and blockchain conference in Grand Bahama from June 21-22, 2018.

132.    At the conference in Grand Bahama, Hvide met with the Minister of Grand Bahama, as well as numerous other investors and players in the fintech space, whom he introduced and encouraged to apply to Holt Accelerator.

133.    As of August 2018, the Holt Accelerator website showed Hvide as a member of the Holt Accelerator team.

134.    Throughout 2018, Hvide played a key role in the development of Holt Accelerator and was instructed by Brendan Dunn and Jan Arp to:

    a.  Assist in the development of the selection process and methodology for Holt Accelerator before their first acceleration program in August 2018.

    b.  Fly to Canada to participate in the first selection day event in August 2018 as a key advisor.

    c.  Select finalists for the first round of portfolio companies for Holt Accelerator in September 2018 and the second round in July 2019.  Two of the companies that Hvide helped select and was assigned to assist with acceleration were Florida-based Fundseeder Technologies of Boca Raton and Ivy Lender of Plantation.  Both of these companies were run by Florida employees, had headquarters in Florida, and had Florida clients.

    d.  Throughout the fall of 2018 and continuing into 2019, Hvide provided advisory and acceleration services to these Florida companies on behalf of Holt Accelerator from his office in Miami as well as in-person meetings.

B E C K   &   L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

e.  One of those in-person meetings was held at Fundseeder's offices in Boca Raton during February 2019 together with its CEO Emanuel Balarie, Marc Bonorino, and Daniel Casanas.  At this meeting, Hvide acted both on behalf of Holt Accelerator as an advisor, as well as for Holt Financial to finalize negotiations for Holt Financial's equity ownership stake in Fundseeder.  During this meeting, Bonorino negotiated for Brendan Dunn's seat on the board of Fundseeder as well as Brendan Dunn's personal equity compensation in Fundseeder.

f.  Consult remotely for other Holt Accelerator portfolio companies and prospects.

g.  Participate in the Holt Fintech Show in Montreal in December 2018.

135.    In 2019, as Hvide began working out of Florida on other opportunities for the Holt companies targeting South America, Hvide continued to work as an advisor for Holt Accelerator and was tasked with exploring the idea for Holt Accelerator to open in South America.

136.    As with Hvide's other efforts until this time, his work in Florida together with Marc Bonorino toward developing the accelerator in Latin America was done on behalf of the various Holt entities: Holt Accelerator, Holt Financial, and Holdun Family Office.

137.    Building a Holt Accelerator franchise in Latin America involved a significant, months-long effort to build relationships with private and governmental investors.

138.    On May 28, 2019, Hvide flew from Miami to Brazil with the blessing and requests of Jan Arp, Maggie Dunphy and Brendan Dunn to start working on securing letters of intent from investors, governments, funds, universities, and other corporate partners.

139.    On July 3, 2019, Jan Arp e-mailed Hvide a draft presentation, presenting Hvide as the head of Holt Accelerator Brazil and the Global Head of Strategy for Holdun Family Office.

140.     On July 8, 2019, Hvide was invited to go to Montreal to present at the upcoming board meeting of Holt Accelerator in Canada as well as selection day for the 2019 Accelerator teams.  Hvide attended and participated in the selection event as an advisor as well as attending a private dinner with Brendan Dunn, Maggie Dunphy, Jan Arp, and Stuart Dunn.

141.     As part of Hvide's trip, he spoke with representatives of Holt Accelerator, L.P., as well as the board of Holt Accelerator, Inc., to present the project, including the various letters of intent executed up to that point.

142.      Hvide is also aware of the involvement of an entity called Holt Accelerator GP Inc. Holt Accelerator GP Inc. is set up as an investment manager for Holt Accelerator, L.P., is owned or controlled by Brendan Dunn and Maggie Dunphy either individually or through various entities, and was also intended to benefit from the Brazil Accelerator project.

143.     As a result of Hvide's presentations to Holt Accelerator L.P. and Holt Accelerator, Inc., he received the Defendants' blessing to proceed with the Brazil accelerator project ("Holt Accelerator Brazil").

144.     On July 26, 2019, Hvide on behalf of Holt Accelerator, Inc., and Bernardo Annoni on behalf of FUNDEP, signed a letter of intent.  FUNDEP is a foundation for the development of technology and companies in the State of Minas Gerais, Brazil, operating out of the Federal University of Minas Gerais in Belo Horizonte.  In the LOI, FUNDEP agreed to support the development of Holt Accelerator Brazil as an investor through its investment arm, FUNDEPAR, as well as to provide introductions to other investors and to generally assist in the development of the accelerator, recruitment of companies for acceleration, and the forming of other partnerships necessary to develop the company.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

145.    On August 5, 2019, Helder Fonseca of GVM Advogados delivered to Jan Arp as CEO of Holt Accelerator Canada and Hvide, designating him CEO of Brazil, their proposal for development of Holt Accelerator and Fund.

146.    On August 14, 2019, while in Miami, Hvide participated in a conference call with Jan Arp to continue developing the strategy and business plan for Holt Accelerator.

147.    On August 22, 2019, Hvide on behalf of Holt Accelerator, Inc. and Alessandro Dadalto on behalf of Invest Center Consultoria Ltda. signed a letter of intent similar in scope and intent to the LOI signed with FUNDEP.  Hvide e-mailed a copy of this document, which showed Hvide signing on behalf of Holt Accelerator, Inc., to Brendan Dunn and Jan Arp.  Brendan Dunn responded, "Awesome news!" Jan Arp responded, "Keep on rollin' partner!! Well done Leif."

148.    On August 22 and 23, 2019, Hvide on behalf of Holt Accelerator, Inc. and CHRONUS Technologia e Automacao Ltda, signed a letter of intent of the same scope and intent as FUNDEP.  Hvide e-mailed Brendan Dunn a copy of this agreement, which showed Hvide signing on behalf of Holt Accelerator, Inc., to which Brendan Dunn responded, "Keep it going!"

149.    Chronus would go on to play a crucial role in the development of Holt Accelerator Brazil, providing local assistance while Hvide was in Miami to develop advantageous business relationships with government and investors in Espirito Santo.

150.    Subsequently, Hvide was given approval to proceed with the proposal from GVM and on August 26, 2019, Hvide held a conference call with GVM to discuss next steps to proceed.

151.    On September 5, 2019, GVM sent its first invoice.  Brendan Dunn confirmed that this was for Holt Accelerator L.P.'s account, which was later confirmed by Bonorino, so a revised invoice to Holt Accelerator L.P. was later sent on September 26, 2019.  On October 23, Maggie Dunphy wired these funds from Holt Accelerator L.P. to GVM.

B E C K   &   L E E

8 3 0 6   M i l l s   D r i v e ,   # 2 4 8   |   M i a m i ,   F l o r i d a   3 3 1 8 3   |   3 0 5 - 2 3 4 - 2 0 6 0

152.    On September 10, 2019, Hvide participated in a conference call with Maggie Dunphy and Jan Arp to discuss the launch requirements.

153.    On September 11, 2019, Jan Arp introduced Hvide as the person "heading our Brazilian operations" to Sandra Peloquin from the Canadian Development Bank in order for Hvide to connect Jan Arp with his relationship at BNDES (Brazilian Development Bank).

154.    On September 12, 2019, Hvide had a kick-off meeting with GVM Advogados and executives from Hieron, a multi-billion fund manager based in Sao Paulo, to pitch the Holt Accelerator Brazil fund and gauge Hieron's interest in acting as a manger and fundraising agent for the fund.

155.    During the remainder of September, Hvide continued working on Holt Accelerator Brazil with Marc Bonorino in Miami as well as via telecommunications with Maggie, Brendan, and Jan.

156.    On September 16, 2019, Maggie Dunphy asked Hvide to provide her with additional information on LOIs that had been signed as well as promising to come back from Holt Accelerator Canada's lawyers with a response on which entity would be participating in Holt Accelerator Brazil.

157.    On September 19, 2019, Hieron delivered to Hvide and GVM its proposal for managing the fund for Holt Accelerator.  This proposal was discussed between Hvide, Brendan Dunn, Maggie Dunphy, Jan Arp, and Marc Bonorino in Miami.

158.    In subsequent emails on September 23, 2019 between GVM, Maggie Dunphy, Marc Bonorino, Jan Arp, Brendan Dunn, and Hvide, Maggie Dunphy confirmed that she and Marc Bonorino would be together in Miami preparing documents requested by GVM to open Holt Accelerator Brazil.

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

159.     On September 27, 2019, Jan Arp invited Hvide to assist in the preparation of the investor presentation for Holt Accelerator Canada's fund, which he performed.

160.     During this time, Maggie Dunphy spent approximately one week in Miami with Marc Bonorino working on Holt Accelerator.

161.     On October 16 and 17, 2019, Jan Arp from his Holt Accelerator e-mail address and Maggie Dunphy from her Holdun Family Office Canada e-mail address, and Hvide from his Holt Accelerator e-mail address, exchanged e-mails concerning the approval of payments to Hvide for "Expenses related to opening the company, the fund, work visas, and preparing the offering."

162.     On October 18, 2019, Hvide was in Brazil to meet with the Vice Governor of Espirito Santo, Jaqueline Moraes, her cabinet, as well as with the Secretary of State for Development, Marcos Navarro, the Secretary of Investments and International Business, Gabriel Feitosa, the President of FAPES (government fund for development of technology) Denio Arantes, the Director of FAPES, Elton Moura, the Chief Economist for Banestes (Espirito Santo's government development bank), Eduarda La Rocque, the President of the Brazilian Institute of Executive Finance, Alessandro Dadalto, as well as Augusto Brunow from Chronus.

163.     On October 30, 2019, Hvide and GVM met with the President and team of the Development Bank of Minas Gerais to cement their strategic and financial support for Holt Accelerator.

164.     On November 1, 2019, Marc Bonorino on behalf of Holt Financial and Hvide on behalf of Holt Accelerator signed a letter of intent with the governor of Espirito Santo.  Parties to this accord included the Secretary of State, Alvaro Duboc, Director of Innovation, Elton Moura, Secretary of Investment, Gabriel Feitosa, Special Director Carlos Santos, Special Director of Relations, Odmar Nascimento, Augusto Brunow, Alessandro Dadalto, and others.  This accord

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

committed the Government of Espirito Santo to support and invest in the launch of the accelerator and fund.

165.    On November 6, Hvide held follow-up presentations with the development bank, sovereign wealth fund, and other government agencies in Espirito Santo to bring in additional financial commitments.

166.    On November 8, 2019, Hvide on behalf of Holt Accelerator Inc., with the approval of Brendan Dunn, secured the services of Hieron to provide the fund administration and fundraising services for the Brazil Accelerator Equity Investment Fund's structuring, implementation, management and distribution of shares.

167.    On November 14, 2019, Hvide had another follow-up meeting with the government of Espirito Santo and FAPES.  During this meeting, they gave Hvide verbal commitments that they would match two-to-one every dollar invested by Holt entities into the Holt Brazil Accelerator.  That same day, Hvide met with the President of Investor Partners, Alessandro Dadalto, who committed to raise R$10 million (approximately USD $2mm) for the Accelerator.

168.    Hvide conveyed this information to Brendan Dunn on November 14, 2019, confirming that Brendan would need to raise at least R$5 million (USD $1.2m) from Holt. Brendan replied that this "[w]on't be a problem."

169.    On November 18, 2019, Hvide met with Pedro Vaa, the head of development for the Government of Minas Gerais to secure additional support in the region.

170.    Hvide returned to Miami on November 24, 2019, and worked with Marc Bonorino and others on the ownership structure of Holt Accelerator Brazil over the following weeks.

171.    On November 21, 2019, Jan Arp e-mailed Hvide a presentation representing Hvide as part of the Holt Accelerator Team, with the designation, "Head, International."

**H.**     **Hvide is Forced to Release his Shares in Holt Financial, but Secures Promises From Brendan Dunn.**

172.     On October 2, 2019, after Hvide had secured most of the letters of intent for the Holt Accelerator Brazil, Daniel Casanas called Hvide to advise him that he needed to sign a release relinquishing his shares in Holt Financial, Ltd. in exchange for 1,000 Shares in Holt Digital Finance Ltd. and 1,000 Shares in Holt Marketplace Ltd., which are subsidiary companies of Holt Financial, Ltd.

173.     Shortly after this call between Casanas and Hvide, Hvide called Casanas back to ask why this demand was being placed.  Casanas informed him that this demand arose as a result of a meeting held between Brendan Dunn, Dunphy, Dempsey, Nottage, Bonorino, and Casanas, wherein Dunn, Dunphy, and Dempsey had wanted to fire Hvide and subsequently take his shares. Casanas relayed to Hvide that Bonorino had reminded (as he had done with Rokk3r) Brendan, Maggie, and Gordon that a company, its shareholders, and/or directors could not simply appropriate a shareholder's interest in a company without giving consideration, which was the reason for crafting the release and presenting it to Hvide.

174.     On October 11, 2019, Daniel Casanas asked Hvide again to sign the release and provide it to Kelly Nottage as "we need to close the round and investors are asking for their shares." Hvide again asked Daniel Casanas why he was being forced to give up his shares.  Daniel Casanas directed Hvide to discuss this with Brendan Dunn.  Hvide was advised by Casanas that if he did not sign the release he would lose his job and Brendan Dunn would get the shares somehow anyway.

175.     At the time, Hvide's 4% stake in Holt Financial was worth $4,000,000.00 as evidenced by third party investments into Holt Financial at 1.0% for $1,000,000.00.

176.     Hvide is unaware of the value, if any, of the shares of these subsidiary companies.

B E C K  &  L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

177.    Just like when he was ousted as CEO of Dunrok, and cut off from Holdun Real Estate Fund, without any real explanation given, this was another dictate handed down from Brendan Dunn, and Hvide was expected to accept it.

178.    But Hvide had put in such tremendous work into Holt Financial and the Brazil Accelerator project, that he was not going to simply accept this.

179.    On October 20, 2019, Kelly Nottage wrote to Hvide asking to schedule a call to discuss the release.  This call took place between Hvide and Nottage, during which Hvide asked Nottage why he was being forced to give up his shares.  Nottage directed Hvide to discuss this question with Brendan Dunn, as Nottage was only authorized to discuss the legal terms of the release.

180.    On November 20, 2019, Hvide had a phone call with Brendan Dunn.

181.    On this phone call, Hvide asked Brendan Dunn, and Brendan Dunn agreed, that as additional consideration (beyond the shares in the subsidiary companies) for Hvide signing the release, Brendan Dunn would (1) commit to open the fund and accelerator in Brazil; and (2) continue paying Hvide's salary, health insurance, and travel expenses.

182.    Hvide confirmed this agreement in a contemporaneous e-mail to Brendan Dunn.

183.    Brendan Dunn did not say on whose behalf he was making this commitment.  He did not need to.  He is the CEO of both Holt Financial, Ltd. and Holdun Family Office, a Founder and Managing Partner of Holt Accelerator, and an officer or director of Holt Accelerator, L.P.  He is the great-grandson of Sir Herbert Holt and a member of the charmed circle of Holt descendants who control their business empire.  His agreement with Hvide was his own personal agreement, which was the same as a commitment on behalf of the companies he ran or helped control, and on whose behalf Hvide labored.

184.    The next day, on November 21, 2019, an attorney from GVM Advogados e-mailed Maggie Dunphy, Marc Bonorino, and Hvide a presentation of the suggested corporate structure of Holt Accelerator Brazil, and Holt Investment Fund Brazil – a fund contemplated to be set up to be part of the Brazil Accelerator deal.

185.    On November 26, 2019, there was a Holt Accelerator Board call, which included Hvide, Jan Arp, Margaret Dunphy, Brendan Dunn, and others.  Hvide attended this call from Miami, where he presented the latest developments and success of Holt Accelerator Brazil.

186.    On November 27, 2019, Maggie Dunphy e-mailed Hvide from her holdun.com e-mail address, as CFO of Holdun Family Office Canada, Inc., giving him instructions related to his budget for work on the Brazil Accelerator project.

187.    On December 6, 2019, Hvide sent an e-mail to Marc Bonorino, Jan Arp, Brendan Dunn, and Margaret Dunphy, with a slightly revised presentation of the structure of the Brazil Accelerator and fund.

188.    Later that day, Hvide and Marc Bonorino, operating from Miami, had a phone call with Maggie Dunphy, Jan Arp, and Brendan Dunn.  On that call, the Defendants present represented to Hvide that the company had already issued Hvide's 1,000 shares in Holt Digital Finance Ltd.and 1,000 shares in Holt Marketplace Ltd. and that all parties agreed to the corporate and economic deal structure for Holt Accelerator Brazil as presented in Hvide's e-mail.

189.    Holt Accelerator Brazil was targeted to be R$200 million in size.  Gross expected returns for the fund according to Jan Arp's own calculations were 2.62 times the investment, or R$524 million. The performance fee on this return is 20%, equal to R$104 million.  25% of that, equal to R$31 million (USD$6 million), was expected to flow to Hvide.  Also, throughout the life

B E C K  &  L E E

8306 Mills Drive, #248  |  Miami, Florida 33183  |  305-234-2060

of the fund, Hvide was expected to earn a salary as manager of the fund equal to $198,000 yearly or at least $1,980,000.00 over the ten-year life of the fund.

190.    Five days later, on December 11, 2019, Brendan Dunn emailed Hvide from his e-mail address as CEO of Holdun Family Office (Bahamas) Limited, asking (in regards to the release) "are we ready to sign this"?

191.    Hvide subsequently transmitted the signed release to Brendan Dunn.  A copy of the release is attached hereto as **Exhibit 1**. In the transmittal e-mail, Hvide stated the terms of the agreement:

> 1.  I have your commitment and support to open the fund and accelerator in Brasil in line with the structure agreed to last week. 2. My position in Brasil, which includes maintaining my salary, health insurance, and paying travel expenses will continue until such time as the organization here is self-supporting. Noting that all monies advanced to startup the operation here need to be put into a loan agreement for repayment."

192.    Hvide never received any confirmation or evidence of receiving the 1,000 Shares in Holt Digital Finance Ltd. and 1,000 Shares in Holt Marketplace Ltd. referenced in the release and as represented as issued on the December 6, 2019, phone call.

193.    On December 10, 2019, Hvide signed an accord with Eduarda La Rocque, Chief Economist for the State Bank of Espirito Santo, Victor Murad, General Manager of Innovation and Technology for the Government of Espirito Santo, Elton Moura, the Director of Innovation for the Espirito Santo Fund for Research and Innovation to bring Holt Accelerator to Espirito Santo, which included government investment matching into the Holt Accelerator.

194.    On December 13, 2019, Hvide provided to Brendan Dunn the deck he requested in English for Holt Accelerator Brazil.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

195.     On December 20, 2019, Hvide returned to Miami to spend the holidays with his parents and children.  This visitation with Hvide's children required weeks of negotiations with Mrs. Hvide's lawyers at a cost of thousands of dollars.

196.     During this time in Miami, as during all of his time in Miami, Hvide continued to work on the Brazil Accelerator and other matters for the Holt entities and Brendan Dunn.

197.     On January 16, 2020, Donovan Braynen, head of IT for Holdun Family Office (Bahamas) Limited, e-mailed Hvide with instructions on the use of a central database.

198.     Throughout this time, there was a weekly Zoom call of Holt Accelerator executives to provide updates on the status of Hvide's activities.

199.     On January 18, 2020, Jan Arp, as managing partner of Holt Accelerator, sent Hvide an e-mail bearing the subject line, "Holt Accelerator Salary," telling Hvide "we are taking over your compensation" and asking him to call him to discuss.

200.     On January 19, 2020, Jan Arp, from his Holt Accelerator e-mail address, invited Hvide and Maggie Dunphy to a meeting to discuss Hvide's "Accelerator Invoices."

201.     On January 3, 2020, Holt Accelerator, L.P. registered to do business in Brazil.

202.     On January 24, 2020, Jan Arp e-mailed Hvide a draft offering memorandum for Holt Accelerator Canada Fund, listing Hvide as a member of the Holt Accelerator Team, with the title, "International Development."

203.     In early February 2020, Marc Bonorino flew down to Brazil to help Hvide prepare for the "roadshow" for the Brazil Accelerator.  The "roadshow," which was due to start in mid-March 2020, refers to the scheduled process of meeting with the various investors and stakeholders to formalize and finalize their investments into the Accelerator or fund to enable them to be formally set up.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

204.    On February 5, 2020, Brendan Dunn, as CEO of Holdun Family Office, e-mailed Hvide, instructing him to call Donovan Braynen (head of IT for Holdun Family Office, Bahamas), because he "needs to review your laptop and install necessary software to ensure your computer meets our policies for all employees."

205.    On February 7, 2020, Jan Arp asked Hvide to edit language for the "commentary for the Q4 Opportunity Fund." Hvide was asked to input commentary on the development of Holt Accelerator Brazil.   For this reason, Hvide believes the Opportunity Fund was financially supporting some or all of the Holt entities involved in the Holt Brazil Accelerator.

**I.    The Defendants Unceremoniously Cut Hvide Off for the Last Time, With No Explanation Given**.

206.    In the last week of February 2020, Hvide's access to his e-mail accounts was unceremoniously shut off.

207.    At this time, the Brazil project was nearly ready to be finalized.  The roadshow was scheduled for mid-March, GVM Advogados had all the paperwork ready to form the necessary entities per the agreed-upon structure, and meetings were scheduled with GVM and Hieron to finalize the offering documents.

208.    Hvide tried contacting GVM, but was told they were not allowed to speak with him about the Brazil accelerator project anymore.

209.    On March 30, 2020, Hvide received his last paycheck.

210.    In May 2020, Leif found out his health insurance was cancelled.  None of the defendants gave him advanced notice of the cancellation, nor the opportunity for alternative insurance, nor the continuation of insurance coverage through COBRA.

B E C K   &   L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

## Additional Jurisdictional Facts Applicable to Certain Defendants

### Holdun Family Office

211.    As described above, "Holdun Family Office," for whom Hvide worked, is a Holt enterprise with offices in the Bahamas, Cayman Islands, and elsewhere.

212.    One of the Holdun Family Office entities, Holdun Family Office LLC, was a Delaware corporation that originally opened in 2011 as an Investment Advisor registered with the SEC and the State of Florida.  Its manager was Carlos Ulloa and its Compliance Officer was Marian Stupka.

213.    This Holdun Family Office entity registered to do business in Florida in August 2011, and submitted annual filings to the Florida Department of State through Sunbiz, including annual reports through April 2017.  Its principal offices were located at 1395 Brickell Avenue, the very same office with which defendants deny having any affiliation.  The last known registration with the SEC and Florida took place in 2017.[2]

214.    In 2019, Holdun Family Office LLC was reconstituted as a Florida corporation and leased offices at 555 Washington Avenue in Miami Beach.  At a meeting in Miami with Michael Blank, Marc Bonorino, Daniel Casanas, Carlos Ulloa, and Hvide, Gordon Dempsey confirmed in a discussion about the progress of setting up the company that Brendan Dunn had already signed the lease agreement for the office in Miami Beach.  Michael Blank was named its Managing Director and Brendan Dunn its CEO.[3]  The offices were recently moved to 2125 Biscayne Boulevard, Suite 324, Miami, Florida.

---

[2]    https://reports.adviserinfo.sec.gov/reports/ADV/158123/PDF/158123.pdf.

[3]    https://wallmine.com/adviser/211801/holdun-family-office-llc.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

215.     More specifically, Holdun Family Office, LLC, as a domestic Florida limited liability company, filed its articles of organization with the State of Florida on January 9, 2019. On July 23, 2019, Brendan Dunn and Holdun Family Office (Bahamas) Ltd. published a press release through Business Wire, announcing the launch of the new Holdun Family Office branch in Miami.[4]

216.     The press release confirmed that "Holdun Family Office," as an enterprise of "a 5th generation Canadian family," has "offices in Montreal, Bahamas and The Cayman Islands."

217.     "Holdun," the press release, went on, "views the establishment of their most recent wealth management firm as a major expansion into the United States."  Brendan Dunn is quoted in the press release as "Global CEO Brendan Holt Dunn of Holdun Family Office."

218.     The press release concludes by further proclaiming the interrelatedness of the Holt/Holdun enterprise: "The Holdun vision and services includes: Family Office Services, Wealth Management, Trust and Corporate Services, Financial Services, Concierge Services and a full digital financial platform and ecosystem operating under the Holt brand."

219.     On April 23, 2019, Holdun Family Office was first registered as an investment advisor with the SEC.[5]  On August 13, 2019 Holdun Family office was registered and approved to do business and service clients in Florida.[6]

220.     Less than two weeks later, on August 26, 2019, the Holdun Family Office, LLC Delaware entity was "Voluntarily Cancelled."

---

[4]      https://www.businesswire.com/news/home/20190723005266/en/Holdun-Family-Office-Expands-Miami-Welcomes-New.

[5]      https://adviserinfo.sec.gov/firm/summary/300709.

[6]      https://adviserinfo.sec.gov/firm/summary/300709.

221.    On June 21, 2021, Holdun Family Office filed its latest "Form ADV" with the Securities and Exchange Commission and the State of Florida.[7]  Form ADV is the uniform form used by investment advisers to register with both the SEC and state securities authorities.  This sworn filing discloses to the public, Florida state regulators, and the SEC: (a) who the beneficial owners of the company are, (b) where their clients are located, (c) how they generate revenue, and (d) how much money they manage, among other disclosures.

222.    Holdun's latest Form ADV[8] reveals the following facts:

    a.   Holdun Family Office LLC is owned by:

        1.   Michael Blank, Managing Director and Florida resident.

        2.   Marian Stupka, CCO and Florida resident (the same compliance officer as the previous iteration of Holdun Family Office, LLC.).

        3.   Holdun Family Investments, LLC (85% majority stake).

    b.   Holdun Family Investments LLC is a Delaware company, which lists three shareholders and directors, Brendan Dunn, (owning greater than 75%), Maggie Dunphy, and Marc Bonorino.  Dunn, Dunphy, and Bonorino thereby exert supermajority control over the Florida company, Holdun Family Office, LLC.[9]

    c.   Brendan Dunn, through his greater than 75% ownership of Holdun Family Investments, LLC, owns at least 63% of Holdun Family Office LLC and is defined by the SEC as a person in control of the business.[10]

---

[7]      https://adviserinfo.sec.gov/firm/summary/300709.

[8]      https://reports.adviserinfo.sec.gov/reports/ADV/300709/PDF/300709.pdf.

[9]      https://wallmine.com/adviser/211801/holdun-family-office-llc.

[10]     https://reports.adviserinfo.sec.gov/reports/ADV/300709/PDF/300709.pdf.

BECK & LEE

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

d.   Holdun Family Office (Bahamas) Limited is described as an entity related to Holdun Family Office LLC.

e.   Holdun Family Office (Florida) and Holdun Family Office (Bahamas) operate under common control (I.e. Brendan Dunn and Maggie Dunphy).

f.   Holdun Family Office LLC manages $120.8 million of financial assets, of which 98.5% ($119 million) belongs to 65 individual U.S. and Florida clients (97% of their 67 clients are U.S. persons).

g.   Holdun Family Office LLC has a single stream of revenue.  Clients pay Holdun Family Office LLC for their services and products based on a percentage of assets under management.  This percentage ranges from 0.5% to 1.75%.

h.   Based on these numbers, Holdun Family Office earns between $595,000-$2,082,000 from U.S. persons.

i.   Given that the company's office is based in Florida; that Florida was the first state in which the company was licensed to do business for the first seven months of its existence;  that the company is only licensed to accept clients from four states (Florida, California, Louisiana, and Texas); and Michael Blank informed Hvide that the biggest source of his clients comes from a Miami-based lawyer, it can reasonably be alleged that a substantial amount of the company's revenue derives from Florida.

223.   As the defendants Brendan Dunn and Maggie Dunphy are the primary beneficiary shareholders and are in control of Holdun Family Office LLC, they derive significant pecuniary benefit from U.S. and Florida clients as well as exert control over the business.

**Holt Accelerator**

43

224.    In May 2018, at the same time that Hvide began his relationship with the defendants in Miami, Brendan Dunn, acting in his capacity as Managing Partner of Holt Accelerator, met Jeffrey Ransdell (Florida resident) of Rokk3r Fuel ExO at 1395 Brickell Avenue to negotiate and finalize a partnership to cross-market Holt Accelerator to the South Florida start-up community and give Rokk3r access to Holt's portfolio companies.  This partnership was marketed to the general public, an example of which was published in the South Florida Business Journal.  Brendan Dunn is also described therein as a board member and investor in Rokk3r Fuel.[11]

225.    The cross-marketing efforts between Holt Accelerator and Rokk3r, together with the work that Hvide performed working for Holt Accelerator to court, select, and advise these companies, resulted in Holt Accelerator successfully securing two Florida clients, Fundseeder and Ivy Lender.

226.    The work that Hvide performed as an agent of Holt Accelerator generated *significant* revenue for the defendants[12]:

    a.  Holt Accelerator earned acceleration fees and/or equity participation in these Florida companies (and by extension its shareholders and directors, which included Brendan Dunn, Maggie Dunphy, and Jan Arp);.

    b.  Brendan Dunn personally received a board seat and equity participation in Fundseeder.

---

[11]    https://www.bizjournals.com/southflorida/news/2018/05/29/rokk3r-fuel-exo-partners-with-holt-accelerator.html.

[12]    Holt Accelerator's business model is to select emerging financial technology companies to participate in their acceleration program for which Holt receives advisory fees and/or equity in these companies as well as favorable investment terms. Occasionally, the management team would also receive board seats on these companies and receive equity compensation directly.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

    c.   Holt Financial received equity participation in Fundseeder, which benefited Brendan Dunn, Maggie Dunphy, and Gordon Dempsey and others.

**Dunrok / Holt Financial**

227.    Dunrok / Holt Financial had substantial, pervasive, and systematic contacts with Florida both as a general course of business through their contractual relationship with Florida residents that made up the majority of the company's employees and service providers during the relevant time period as well as specifically with regards to Hvide and the claims herein.

228.    The company was given fair warning that if its nerve center operated from an office in Miami and was paid in Florida, the company and its stockholders could be exposed to litigation in the United States and Florida specifically.  The actual nerve center was Miami, Florida, where the company's management team lived and operated from on a regular basis.  The vast majority of in-person company meetings involved Dunn, Dunphy, and Dempsey traveling to Miami to meet with the management team instead of the management team traveling to The Bahamas to meet with Dunn, the only employee of Dunrok/Holt Financial who maintained residency in The Bahamas.  Although Dunrok/Holt Financial's headquarters of record are listed as Albany Center, Bahamas, in practice that office was maintained and staffed by Holdun Family Office, Ltd. which was only used by the other officers and directors of Dunrok/Holt Financial who traveled to The Bahamas for occasional meetings.

229.    Hvide, as the founder and initially CEO of the company, was a key part of the "nerve center" of the company; he created the business plan, spearheaded development of all aspects of company's software development, he led fundraising efforts, he led human resources hires, and he guided the corporate strategy.  Hvide's work for the company was performed from

offices maintained by the defendants in Florida and was paid for his services into his Florida bank account from a USA bank account of the defendant.

**Holdun Family Office Ltd. (Bahamas)**

230.    Holdun Family Office's Florida agents at the time of the events included:

    a.  Marc Bonorino, Florida resident, acting as Global Head of Compliance for Holdun Family Office.

    b.  Carlos Ulloa, agent working for Holdun Family of Funds[13] and other Holdun entities.

    c.  James Caprio, agent working for Holdun Family of Funds.

    d.  Timothy McCarthy, Florida resident, acting as agent and employee of Holdun Family Office.

    e.  Hvide, acting as its agent and employee in Miami, insofar as he labored on behalf of Holdun Family Office in addition to the other Defendants.

231.    According to the Fund's offering memorandum Holdun Real Estate Fund owns a portfolio of US C-Corporations which own and operate real estate in Florida.  These companies operating in Florida pass-through their profits to Holdun Family Office (Bahamas) Limited in the form of performance and investment manager fees.  The annual manager fees equals 2% of the net asset value of the portfolio and the performance fee 20% of profits on the portfolio.

232.    Hvide's work for the Defendants was instrumental in creating the fund and investment prospectus utilized to market the Holdun Real Estate Fund which generates revenues

---

[13]    Holdun Family of Funds includes the Holdun Opportunity Fund, Holding Income Fund, and the Holdun Real Estate Funds.  It should be noted that although these funds were separate legal entities, they form central components of Holdun Family Office's investment portfolio for its clients.  Holdun Family Office acts as investment manager from these funds, directing strategy and receiving fee revenues for managing them.

B E C K   &   L E E

8 3 0 6   M i l l s   D r i v e ,   # 2 4 8   |   M i a m i ,   F l o r i d a   3 3 1 8 3   |   3 0 5 - 2 3 4 - 2 0 6 0

for the Defendants from Florida corporations which resulted in damages to Hvide upon which he bases his claims.

## Holt Accelerator

233.    Holt Accelerator had substantial contacts with Florida.

234.    Holt Accelerator purposefully marketed to Florida persons which resulted in Holt Accelerator securing two Florida clients from which it derived pecuniary gain.

235.    In support of these clients and other marketing and business development, Holt Accelerator employed, communicated, held meetings, and directed Hvide's activities in Florida, which relate to Hvide's damages upon which he bases his claims.

## Brendan Dunn

236.    Brendan Dunn has substantial, pervasive, and systematic contacts with Florida both as a general course of business through his command of a vast array of business enterprises operating in Florida from which he has pecuniary benefit as well as specifically with regards to Hvide and the claims herein.

237.    Dunn directed Hvide's activities in Miami through regular phone calls, e-mails, text messages, and in-person meetings.  Hvide's activities were performed on behalf of (a) Holt Financial, Ltd., (b) Holdun Family Office (Bahamas) Ltd., and (c) Holt Accelerator, all of which Brendan Dunn personally benefited from as a shareholder either individually or through various holding companies.

238.    Dunn's in-person meetings with Hvide, which formed the genesis of Hvide's relationship with him and all Defendants, and resulted directly in the creation of Dunrok/Holt Financial, Ltd., were held in Miami.

239.    Dunn continued traveling to Miami for high-level meetings with Hvide and his other Florida agents to direct the operations of Dunrok, Holt Financial, Holdun Family Office, and Holt Accelerator.

240.    Dunn's in-person meetings with Hvide in the State of Florida as well as his telecommunications into the State of Florida started, furthered, and directly concerned Hvide's work for the Defendants which resulted in damages to Hvide upon which he bases his claims.

**Margaret Dunphy**

241.    Dunphy has substantial, pervasive, and systematic contacts with Florida both as a general course of business through her financial oversight of and director positions in a vast array of business enterprises operating in Florida from which she gains pecuniary benefit as well as specifically with regards to Hvide and the claims herein.

242.    Acting as CFO and Director, Dunphy regularly traveled to Miami to meet with Hvide and other agents and executives from Holdun Family Office Ltd, Holdun Family Office LLC, Holt Accelerator, and Dunrok/Holt Financial to plan corporate financial matters.

243.    Dunphy's numerous in-person meetings with Hvide in Florida as well as her telecommunications into Florida directly concerned Hvide's work for the Defendants which resulted in damages to Hvide upon which he bases his claims.

**Stuart Dunn**

244.    At all times material to this action, Stuart Dunn was a Director of the Board at both Holt Financial, Ltd. and Dunrok.  He was present for all board meetings and voted on all signficiant decisions that form the basis for Plaintiff's claims in this action.

245.    Stuart Dunn was present in South Florida for several of the meetings.  He is largely in control of the purse strings for the various Holdun enterprises, and typically used Maggie Dunphy to execute on his decisions.

246.    All conditions precedent to the bringing of this action have been performed, waived, excused, or would be impossible.

247.    Plaintiff has been required to retain the undersigned attorneys and pay them a reasonable fee.

## COUNT 1—BREACH OF CONTRACT

(Against Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.

248.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

249.    Hvide entered into a contract with Brendan Dunn, acting on behalf of himself, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.

250.    Brendan Dunn, in his aforementioned capacities, made an offer wherein in exchange for Hvide signing the release giving his Class A shares back to Holt Financial, Hvide would receive shares in two subsidiary companies as well as Brendan's commitment to support and open the fund and accelerator in Brazil, and to protect and maintain Hvide's position in the organization, inclusive of his salary, American health insurance, and travel expenses to Brazil until the Brazilian operation became self-supporting.  This offer was conveyed to Hvide by telecommunications into the State of Florida.

251.    On a December 6, 2019 conference call attended by Hvide and Marc Bonorino while in Miami, Brendan Dunn, Maggie Dunphy, and Jan Arp, acting on behalf of Holt Accelerator, Holdun Family Office (Bahamas) Ltd., and Holt Financial, Ltd.,  jointly confirmed to

Hvide the specifics of the offer with regards to the structure of the Brazil accelerator and fund, as outlined in writing by GVM Advogados and as modified in a subsequent writing by Hvide.

252.     Hvide subsequently accepted the offer in writing by signing the release, releasing his Class A shares in Holt Financial Ltd, and transmitting it by email to Brendan Dunn, specifically confirming the terms of the agreement.

253.     Hvide substantially performed the agreement, transmitting the release and organizing and preparing the accelerator and fund, such that it was on the precipice of being consummated.

254.     Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd., breached the agreement with Hvide:

     a.   1,000 shares in Holt Digital Finance Ltd. and 1,000 shares in Holt Marketplace Ltd. were never delivered to Hvide.

     b.   In the week of February 17, 2020, Hvide was unceremoniously terminated without cause or reason: his e-mail accounts shut off and his access to the companies and personnel denied – with his salary and health insurance later to be stopped.  He was cut out of the deal.

255.     As a result, Hvide was damaged in an amount greater than $8 million.

256.     Although he received a salary through the end of March 2020, he has been cut out of the organization, including being deprived of his future share and stake in the future Brazilian operation as expressly contemplated and agreed to.

257.     Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

B E C K   &   L E E

8 3 0 6   M i l l s   D r i v e ,   # 2 4 8   |   M i a m i ,   F l o r i d a   3 3 1 8 3   |   3 0 5 - 2 3 4 - 2 0 6 0

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 2—UNJUST ENRICHMENT

(Against Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.)

258.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

259.    Through months of effort, constant travels from Florida to Brazil, Canada, and The Bahamas, as well as the forging of substantial relationships with private and governmental actors in Florida and Brazil, securing legal and other professional support, and setting up the Brazil accelerator and fund transaction up to the precipice of completion, Hvide has conferred a benefit on Brendan Dunn, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.

260.    Those defendants have voluntarily accepted and retained the benefit conferred.

261.    The circumstances are such that it would be inequitable for the defendants to retain the benefit without making just compensation to Hvide therefor.

262.    The salary Hvide was paid by Defendants did not justly compensate Hvide for the work he performed for Defendants.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 3—BREACH OF CONTRACT

(Against Brendan Dunn and Holdun Family Office (Bahamas) Ltd.)

263.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

51

264.    Hvide entered into a contract with Brendan Dunn, acting on behalf of himself and Holdun Family Office (Bahamas) Ltd.

265.    Brendan Dunn, in his aforementioned capacities, made an offer wherein in exchange for Hvide's work on preparing the Holdun Real Estate Fund, Hvide would receive equity in the Holdun Real Estate Fund.

266.    Hvide subsequently accepted the offer by beginning work on the prospectus.

267.    Hvide substantially performed the agreement, delivering the completed draft prospectus for the Holdun Real Estate Fund and working with third party counsel to finalize the document, such that it was on the precipice of being consummated.

268.    Brendan Dunn and Holdun Family Office (Bahamas) Ltd. breached the agreement with Hvide.

269.    Holdun Real Estate Fund was opened in August 2019 and Hvide was not given participation or recognition in the fund despite Brendan Dunn's prior representations.

270.    As a result, Hvide was damaged in an amount greater than $2 million.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $2 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 4—UNJUST ENRICHMENT

(Against Brendan Dunn, Holdun Family Office (Bahamas) Ltd., and HOLT Funds, SPC)

271.    Hvide incorporates paragraphs 1 through 247 as if fully alleged herein.

272.    Through months of effort in setting up the Holdun Real Estate fund, Hvide has conferred a benefit on Brendan Dunn, Holdun Family Office (Bahamas) Ltd., and HOLT Funds, SPC.

B E C K   &   L E E

8 3 0 6   M i l l s   D r i v e ,   # 2 4 8   |   M i a m i ,   F l o r i d a   3 3 1 8 3   |   3 0 5 - 2 3 4 - 2 0 6 0

273.    Those defendants have voluntarily accepted and retained the benefit conferred.

274.    The circumstances are such that it would be inequitable for the defendants to retain the benefit without making just compensation to Hvide therefor.

275.    The salary Hvide was paid by Defendants did not justly compensate Hvide for the work he performed for Defendants.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $2 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 5—FRAUDULENT INDUCEMENT

(Against Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.)

276.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

277.    Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd. made false statements to Hvide concerning material facts.

278.    More specifically, Margaret Dunphy and Jan Arp were aware of Dunn's promise to Hvide set forth in paragraphs 180 through 193, above.

279.    Then, on the December 6, 2019 phone call described in paragraph 251, above, each of the individual defendants, acting individually and/or on behalf of the corporations for whom they were officers, directors, or agents, stated or affirmed that 1,000 shares in Holt Digital Finance Ltd. and 1,000 shares in Holt Marketplace Ltd. had already been issued to Hvide, and were ready to be delivered to him upon Hvide's signing and transmittal of the release.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

280.    These defendants also represented that they would fund and support the Brazil accelerator in accordance with the agreed-upon structure, as well as maintain Hvide's salary and position in the organization.

281.    In fact, Brendan Dunn, Maggie Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd. knew these representations to be false.  At no point were the 1,000 shares in each of Holt Digital Finance and Holt Marketplace actually issued to Mr. Hvide.

282.    At the time of making these false representations in December 2019 while Hvide was operating out of Florida, these defendants knew and had the intention of inducing Hvide to release his shares in Holt Financial without giving him just consideration, thereby depriving Hvide of the economic benefit of his ownership in the company with the intention of enriching the Holt entities and themselves with his ownership stake in Holt Financial.

283.    The defendants' representations that the shares in each of Holt Digital Finance and Holt Marketplace had in fact been issued and were "ready to go" if Hvide would proceed with the transaction reasonably and justifiably led Hvide to enter into the transaction, sign the release, and transmit it to Dunn.

284.    Defendants' representations that they would fund and support the Brazil accelerator in accordance with the agreed-upon structure, as well as maintain Mr. Hvide's salary and position in the organization reasonably and justifiably led Hvide to enter into the transaction, sign the release, and transmit it to Dunn.

285.    Hvide's reasonable and justifiable reliance on the defendants' false representations was to his detriment.  Not only did the defendants fail to deliver the 1,000 shares in each of Holt Digital Finance and Holt Marketplace to Mr Hvide, but the defendants also failed to deliver on

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

their promise to fund and support the Brazil accelerator and fund as structured, and continue Mr. Hvide's salary and position in the organization, thereby depriving Hvide of his future share and stake in the organization as expressly contemplated and agreed to.

286.    In the week of February 17, 2020, Hvide was unceremoniously terminated without cause or reason: his e-mail accounts shut off and his access to the companies and personnel denied – with his salary and health insurance to be stopped.

287.    As a result, Hvide was damaged in an amount greater than $8 million.

288.    Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

289.    As a direct and proximate result of these defendants' fraudulent inducement, Hvide has also suffered great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 6—CIVIL CONSPIRACY TO DEFRAUD

(Against Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.)

290.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

291.    Brendan Dunn, Margaret Dunphy, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd. acted in concert and had an agreement among one another to defraud Hvide as described above.

292.    They did so through the fraudulent misrepresentations described in the previous count.

293.    As a result, Hvide was damaged in an amount greater than $8 million.

B E C K & L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

294.    Although he received a salary through the end of March 2020, he has been cut out of the organization, deprived of his future share and stake in the organization as expressly contemplated and agreed to.

295.    Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

296.    As a direct and proximate result of these defendants' conspiracy to defraud, Hvide has also suffered great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 7—TORTIOUS CIVIL CONSPIRACY

(Against Brendan Dunn, Margaret Dunphy, Stuart Dunn, Jan Arp, Gordon Dempsey, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd.)

297.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

298.    Brendan Dunn, Margaret Dunphy, Stuart Dunn, Jan Arp, Holt Financial, Ltd., Holt Accelerator, Inc., Holt Accelerator, L.P., and Holdun Family Office (Bahamas) Ltd., acting in unison, and by agreement among themselves, exercised a power of coercion over Hvide by the malicious use of economic influence that they exerted over him. "Florida courts recognize an independent claim of civil conspiracy, i.e., without the need for an underlying tort, only when it is established that the conspirators had the power of coercion through numbers or their economic influence." *Carles Const., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 56 F. Supp. 3d 1259, 1281 (S.D. Fla. 2014) (citing *Churruca v. Miami Jai–Alai, Inc.*, 353 So. 2d 547, 550 (Fla.1977);

*Churruca*, 353 So. 2d at 550 ("The essential elements of this tort are a malicious motive and coercion through numbers or economic influence.").

299.     Starting in Fall 2018, Brendan Dunn coerced Hvide into spending thousands of dollars on business travel with the promise that they would be covered by the company and then utilizing Gordon Dempsey to deliver the message that he would not be repaid.  This pattern of not paying Hvide's business travel undertaken for the benefit and at the behest of the defendants was repeated systematically and repeatedly throughout Hvide's employment.

300.     Brendan and Maggie promised that although salary payments would be suspended during the transition from Dunrok to Holt Financial he would be repaid as soon as the company opened a new bank account.  They then utilized Gordon Dempsey to deliver the message that neither his accrued and unpaid salary nor his expense reports would be paid.  Hvide was also maliciously singled out in this instance, as all other carryover liabilities from Dunrok to Holt Financial, such as Marc Bonorino's salary, Daniel Casanas' salary, Gordon Dempsey's salary, accounts payable with the Florida marketing agency, and the account payable with Rokk3r were paid.

301.     The defendants also singled out Hvide for a reduction in salary in January of 2019, again maliciously wielding their economic influence over Hvide.

302.     The defendants repeatedly threatened Hvide with termination every time they cut him out of a deal when it neared consummation. The only option he was given to avoid being terminated was to start on the next project.

303.     These malicious acts of economic influence left Hvide working for the defendants in a constant state of economic fear.

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

304.     These included the initial, unexplained decision to remove him as CEO of Dunrok, and re-install him in a different position with less salary, shares, and status, while installing none other than Brendan Dunn as CEO.

305.     These also included his being cut out of the Holdun Real Estate Fund.

306.     And these included the unexplained demand that Hvide release his shares in Holt Financial.

307.     These finally culminated in Hvide's unexplained, unceremonious termination, without communication, cause, or explanation.

308.     As had been explained to Brendan Dunn by Bonorino on multiple occasions, a company, its shareholders, and/or directors are not able to simply remove or devalue an individual shareholder's interest in a company without giving that shareholder just consideration.  In the case of Rokk3r, they were removed through a concerted effort by multiple people acting together to achieve this goal.

309.     Brendan Dunn faced a similar obstacle with Hvide: He could not appropriate Hvide's shares without spending millions to give just consideration.   The only plausible explanation, given the defendants' past behavior, the almost-consummated state of the deal, and the circumstances of Hvide's termination, is that by putting Hvide into a situation where he would "willingly" give up his ownership interest in Holt Financial, they would be able to appropriate Hvide's share ownership without a genuine financial cost.

310.     Dunn was unable to act alone to convince Hvide to willingly give up his shares; to do so required the help of his co-conspirators, Maggie Dunphy, Gordon Dempsey, and Jan Arp. These defendants were able to act in concert to push Hvide with economic incentives (offers of new business opportunities, such as the Holdun Real Estate Fund and Holt Accelerator Brasil) and

economic threats (unpaid expenses, unpaid salary, and threat of termination) to willingly sign over his shares in Holt Financial, with all of the benefits of his labor and the transaction going to the defendants, and none to Hvide.

311.    Thus acting in concert and upon Hvide, by so exercising economic power of coercion over him to his detriment, the defendants have committed an actionable, independent wrong.

312.    As a result, Hvide was damaged in an amount greater than $8 million.

313.    Although he received a salary through the end of March 2020, he has been cut out of the organization, deprived of his future share and stake in the organization as expressly contemplated and agreed to.

314.    Alternatively, Hvide was deprived of his Class A Shares in Holt Financial, Ltd. without receiving the promised-for consideration in exchange.

315.    As a direct and proximate result of these defendants' tortious civil conspiracy, Hvide has also suffered great emotional pain and suffering, and reputational damage.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 8—DECLARATORY RELIEF

(Against all Defendants)

316.    Hvide incorporates paragraphs 1 through 247 as if fully set forth herein.

317.    Hvide is in doubt as to his rights and status under his agreement with Brendan Dunn, in which Hvide signed a release, releasing his Class A shares in Holt Financial Ltd., and in which Dunn committed to support and open the fund and accelerator in Brazil, and to protect and

maintain Hvide's position in Brazil, inclusive of his salary, health insurance, and travel expenses until the Brazil fund and accelerator became self-supporting.

318.     Subsequently, on a December 6, 2019 telephone conference, representatives of Holt Accelerator, Holdun Family Office (Bahamas) Ltd., and Holt Financial, Ltd., and Holt Accelerator L.P., agreed to the specifics of the Brazil accelerator and fund, as outlined in writing by GVM Advogados and as modified in a subsequent writing by Hvide.

319.     Hvide subsequently confirmed this agreement in writing to Brendan Dunn in the same e-mail transmitting the release, specifically noting the corporate structure agreed to on the December 6, 2019 call.

320.     Several uncertainties arise from this agreement, including the capacities in which Brendan Dunn made this agreement, the fact that Hvide never received any confirmation of receiving the 2000 shares contemplated in the release, and the fact that Hvide was ultimately cut off from and out of the Brazil accelerator deal, thereby putting into question whether the agreement fails for lack of consideration and Hvide should be compensated for the then-present value of the shares of Holt Financial, Ltd. that he ostensibly released.

321.      Hvide is entitled to a declaration as to his rights and status under this agreement, and to have these doubts removed, including a declaration:

      A.     Of the capacities in which Brendan Dunn made this agreement.

      B.     Whether Hvide is entitled to receive back or be compensated for the value of his Holt Financial shares by virtue of the fact that he was cut out of the Brazil Accelerator deal in consideration for which he gave up the shares.

B E C K  &  L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

C.      Whether Hvide is entitled to receive back or be compensated for the value of his Holt Financial shares by virtue of the fact that he was cut out of the Brazil Accelerator deal in consideration for which he gave up the shares.

D.      Whether Hvide is entitled to receive or be compensated for the value of the 2000 shares contemplated in the release, which he never received.

E.      Whether Dunn or any of the other defendants on whose behalf he may have made the agreement is required to consummate the Brazil accelerator deal as agreed to on the March December 6, 2019, phone call or to compensate Hvide for the value of this lost opportunity.

322.    There is a bona fide, actual, present practical need for the declaration.

323.    The declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

324.    Some immunity, power, privilege or right of Hvide's is dependent upon the facts or the law applicable to the facts.

325.    The Defendants have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law.

326.    The relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment declaring the rights and status of Hvide and the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

## COUNT 9—UNJUST ENRICHMENT

(Against Holdun Family Office, LLC)

327.    Hvide incorporates paragraphs 1 through 247 as if fully alleged herein.

328.    Hvide worked with Michael Blank to develop the Miami branch of the Holdun Family Office, which is now run through Holdun Family Office, LLC.

329.    Defendant Holdun Family Office LLC voluntarily accepted and retained the benefit conferred by Hvide.

330.    The circumstances are such that it would be inequitable for Holdun Family Office, LLC to retain the benefit without making just compensation to Hvide therefor.

331.    Hvide was not compensated for the benefits conferred on Holdun Family Office, LLC.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 10—UNJUST ENRICHMENT

(Against Michael Blank)

332.    Hvide incorporates paragraphs 1 through 247 as if fully alleged herein.

333.    Hvide conferred benefit on Michael Blank by working with him to develop the Miami branch of the Holdun Family Office, of which Blank became CEO and shareholder earning substantial fees and equity.

334.    Defendant Michael Blank voluntarily accepted and retained the benefit conferred by Hvide.

B E C K   &   L E E

8 3 0 6   M i l l s   D r i v e ,   # 2 4 8   |   M i a m i ,   F l o r i d a   3 3 1 8 3   |   3 0 5 - 2 3 4 - 2 0 6 0

335.    The circumstances are such that it would be inequitable for Michael Blank to retain the benefit without making just compensation to Hvide therefor.

336.    Hvide was compensated for the benefits conferred on Defendant Michael Blank.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

## COUNT 11—CONVERSION

(Against Brendan Dunn, Stuart Dunn, and Maggie Dunphy)

337.    Hvide incorporates paragraphs 1 through 247 as if fully alleged herein.

338.    Pursuant to the Deed of Release (**Exhibit 1** hereto), Hvide was entitled to 1,000 shares in Holt Digital Finance Ltd. and 1,000 shares in Holt Marketplace Ltd.

339.    Brendan Dunn, Stuart Dunn, and Maggie Dunphy jointly conspired at a meeting sometime after the Release was signed to ensure that Hvide was deprived of these shares permanently or for an indefinite time.  The acts of these individuals were unauthorized and contrary to law.

340.    Hvide has made demand for the return of these shares but the property has not been relinquished.

341.    The defendants to this count directed their foregoing tortious conduct at Florida because that was where Hvide was residing at the time they engaged in acts to deprive Hvide of his property.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

B E C K & L E E
8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

## COUNT 12—BREACH OF FIDUCIARY DUTY

(Against Brendan Dunn, Stuart Dunn, and Maggie Dunphy)

342.    Hvide incorporates paragraphs 1 through 247 as if fully alleged herein.

343.    At all times material to this claim, Hvide was the beneficial owner of shares in Holt Financial, Ltd.

344.    Brendan Dunn, as the CEO and Chairman of the Board of Holt Financial, Ltd., and Stuart Dunn and Maggie Dunphy, both directors of Holt Financial Ltd., owed all shareholders, including Hvide, fiduciary duties to act in good faith and in the best interest of the corporation.

345.    Brendan Dunn, Stuart Dunn, and Maggie Dunphy breached their fiduciary duties to Hvide.  Instead of acting in good faith and in the best interest of Hold Financial Ltd. and its shareholders, these defendants used their position of influence, power, and authority to target Hvide's ownership state and then to dilute, diminish and then entirely eliminate Hvide's ownership stake in the company, while re-allocating Hvide's former shares to themselves.

346.    The defendants to this count directed their foregoing tortious conduct at Florida because that was where Hvide was residing at the time they engaged in acts to deprive Hvide of his ownership stake.

347.    As a direct and proximate result of the defendants' breach of fiduciary duty, Hvide suffered damages.

**WHEREFORE**, Plaintiff, Leif-Erik Hvide, demands the entry of a judgment for damages in an amount greater than $8 million, costs, and prejudgment interest against the defendants named in this count, and for any such other and further relief that this Court deems just and proper.

B E C K   &   L E E

8306 Mills Drive, #248 | Miami, Florida 33183 | 305-234-2060

## <u>JURY TRIAL DEMANDED</u>

Hvide demands a jury trial on all matters so triable.


DATED: February 28, 2022

                  RESPECTFULLY SUBMITTED,


                  /s/ Jared H. Beck
                  By: Jared H. Beck

                  **BECK & LEE TRIAL LAWYERS**
                  JARED H. BECK
                  Florida Bar No. 20695
                  ELIZABETH LEE BECK
                  Florida Bar No. 20697
                  8306 Mills Dr., #248
                  Miami, FL 33183
                  Telephone:    (305) 234-2060
                  Facsimile:    (786) 664-3334
                  jared@beckandlee.com
                  elizabeth@beckandlee.com

                  *Attorneys for Plaintiff*

# Exhibit 1

**COMMONWEALTH OF THE BAHAMAS**

New Providence

# R E L E A S E

IN CONSIDERATION for the issuance of 1000  Shares in Holt Digital Finance Ltd. a Cayman Islands Exempted Company and 1000 Shares in Holt Marketplace Ltd. an International Business Company incorporated in the Commonwealth of the Bahamas but without any admission of liability therefor (the receipt and sufficiency whereof is hereby acknowledged) I, Leif Hvide the undersigned of 37 Country Rd. Golf, Florida and sole Director and shareholder of DRK MGMT Ltd., an International Business Company incorporated in the Commonwealth of the Bahamas, hereby release and forfeit to Holt Financial Limited, an International Business Company incorporated in the Commonwealth of the Bahamas ("Holt Financial") 1,400 Class A shares previously issued to DRK MGMT Ltd. for my benefit and in my capacity as Head of Product Development of Holt Financial and further for DRK MGMT Ltd., myself, our heirs, executors, administrators, and assigns release and forever discharge Holt Financial their successors, heirs, agents, employees, or assigns from any and all claims, demands, actions or suits of any kind or nature whatsoever which I now have or at any time hereafter I, DRK MGMT Ltd. or my heirs, executors, or administrators may have or but for the execution of this deed could or might have had arising out of or in respect of the employment and/or engagement of myself the said Leif Hvide by Holt Financial.

It is further agreed that I, Leif Hvide, shall not reveal to any person, persons or Company any of the details of this release.

I, Leif Hvide, the undersigned warrant and represent that I as the sole Director and shareholder of DRK MGMT. Ltd. have the capacity and do hereby bind and commit DRK MGMT Ltd. as set our herein and rely solely upon my own judgment and without influence by anyone in making this settlement, and I fully understand and voluntarily accept the terms of this Release.

IN WITNESS WHEREOF I have hereunto set my hand and seal this _11th_ day of _December_, A.D. 2019.

_____
Leif Hvide

Signed Sealed and Delivered          )
                                     )
by the said Leif Hvide               )
                                     )
in the presence of:-                 )          _____

IN WITNESS WHEREOF the Common Seal of DRK MGMT Ltd. was hereunto affixed this _11th_____ day of _December_____, A.D. 2019.

_____

Leif Hvide, Director

The Common Seal of DRK MGMT Ltd. was affixed hereto by Leif Hvide the Director of the Company and the said Leif Hvide affixed his signature hereto in the presence of:

_____

**COMMONWEALTH OF THE BAHAMAS**

New Providence

Dated: _Dec. 11th_ 2019

**Leif Hvide**

**TO**

**Holt Financial Limited**

============================

**R E L E A S E**

============================

Holt Financial Limited
**Suite #303**
**Albany Financial Center**
**Nassau, Bahamas**

## <u>VERIFIED RETURN OF SERVICE</u>

| State of Florida | County of Dade | Circuit Court |
|---|---|---|

Case Number: 2022-3759-CA-01

Plaintiff:
**LEIF-ERIK HVIDE**

vs.

Defendant:
**HOLDUN FAMILY OFFICE,LLC; HOLT FINANCIAL,LTD.; HOLDUN FAMILE OFFICE(BAHAMAS) LIMITED; HOLT ACCELERATOR INC.; HOLT ACCELERATOR, L. P.; HOLT FUNDS SPC; BRENDON HOLT DUNN; MARGRET "MAGGIE" DUNPHY; STUART DUNN; JAN CHRISTOPHER ARP; GORDON DEMPSEY; AND MICHAEL A. BLANK**

For:
Elizabeth Lee Beck
BECK & LEE BUSINESS TRIAL LAWYERS
12485 Sw 137th Avenue
#205
Miami, FL 33186

Received by C. ZIRKLE on the 2nd day of March, 2022 at 4:28 pm to be served on **HOLDON FAMILY OFFICE, LLC REGISTERED AGENT ALAN B COHN, 200 E BROWARD BLVD, SUITE 1800, FORT LAUDERDALE, FL 33301**.

I, CHARLES ZIRKLE, do hereby affirm that on the **3rd day of March, 2022** at **11:33 am, I:**

served the **CORPORATE - REGISTERED AGENT:** by delivering a true copy of the **CIVIL ACTION SUMMONS; COMPLAINT AND DEMAND FOR JURY TRIAL; EXHIBIT** with the date and hour of service endorsed thereon by me, to: **ALAN B. COHN** as **Registered Agent** for **HOLDON FAMILY OFFICE, LLC REGISTERED AGENT ALAN B COHN** at the address of **200 E BROWARD BLVD, SUITE 1800, FORT LAUDERDALE, FL 33301**, and informed said person of the contents therein, PURSUANT TO F. S. 48.081(3).

I certify that I am over the age of 18, have no interest in the above action, and I am a Special Process Server, in good standing, in the judicial circuit in which the process was served. Under Penalties of perjury, I declare that I have read the forgoing document and that the facts stated in it are true.

_Charles Zirkle_

**CHARLES ZIRKLE**
SPS #110

**C. ZIRKLE**
**3408 N.W. 68TH CT**
**FORT LAUDERDALE, FL 33309**
**(754) 422-9788**

Our Job Serial Number: CZP-2022000044

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5n

| CIVIL DIVISION | **CIVIL ACTION SUMMONS**<br>Personal Service on a Natural Person<br>(En Español al Dorso)<br>(Francais Au Verso) | CASE NUMBER<br>2022-3759 CA01 |
|---|---|---|
| PLAINTIFF(S)<br><br>LEIF-ERIK HVIDE | vs. DEFENDANT(S)<br><br>HOLDUN FAMILY OFFICE, LLC;<br>HOLT FINANCIAL, LTD.; HOLDUN<br>FAMILY OFFICE (BAHAMAS) LIMITED;<br>HOLT ACCELERATOR INC.; HOLT<br>ACCELERATOR, L.P.; HOLT FUNDS SPC;<br>BRENDAN HOLT DUNN; MARGARET<br>"MAGGIE" DUNPHY; STUART DUNN; JAN<br>CHRISTOPHER ARP; GORDON DEMPSEY;<br>and MICHAEL A. BLANK | CLOCK IN |

| To Defendant:<br><br>**HOLDUN FAMILY OFFICE, LLC** | Address (registered agent):<br><br>**COHN, ALAN B**<br>**200 E BROWARD BLVD STE 1800**<br>**FORT LAUDERDALE, FL 33301** |
|---|---|

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with the Clerk of this court.  A phone call will not protect you; your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

Dade County Courthouse
Clerk of Courts
Room 138
73 West Flagler Street
Miami, Florida  33130

Additional Court locations are printed on the back of this form.

You must also mail or take a copy of your written responses to the "Plaintiff/Plaintiff's Attorney" named below.

| Plaintiff/Plaintiff's Attorney<br><br>Elizabeth Lee Beck, Esq. | Address:<br><br>BECK & LEE TRIAL LAWYERS<br>8306 Mills Dr., #248<br>Miami, FL 33183 |
|---|---|

TO EACH SHERIFF OF THE STATE OF FLORIDA:  You are commanded to serve this Summons and a copy of the Complaint of this lawsuit on the above named defendant.

| CLERK OF COURTS | BY: _____<br>325973 | COURT SEAL | DATE<br>MAR 0 1 2022 |
|---|---|---|---|

ALAN B. COHEN
REGISTERED AGENT

11:33AM
3/3/22

44

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene 20 dias contados a partir del recibo de esta notificación para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefónica no lo protegerá.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número de caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefónica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona demoninada abajo como "Plaintiff/Plaintiff Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont été entreprises contre vous.  Vous avez 20 jours consécutifs á partir de la date de l'assignation de cette citation pour déposer une reponse écrite á la plainte ci-jointe aupres de ce tribunal.  Un simple coup de téléphone est insuffisant pour vous protéger.  Vous étes obligé de déposer votre réponse écrite, avec mention du numéro de dossier ci-dessus et du nom des parties nommées ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne déposez pas votre réponse écrite dans le délai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent., et vos biens peuvent etre saisis par la suite, sans aucun préavis ultérieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requérir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez téléphoner á un service de reference d'avocats ou a un bureau d'assistance juridique (figurant á l'annuaire de téléphones)

Si vous choisissez de déposer vous-méme une reponse ecrite, il vous faudra également, en méme temps que cette formalité, faire parvenir ou expédier une copie de votre reponse ecrite au "Plaintiff/Plaintiff Attorney" (Plaignant ou a son avocat) nommé ci-dessous.

## ADDITIONAL COURT FACILITY LOCATIONS

Joseph Caleb Center (20)
Room 205
5400 N.W. 22 Avenue
Miami, Florida  33142

Hialeah District Court (21)
55 S.W. 4 Avenue
Hialeah, Florida  33010

North Dade Justice Center (23)
Room 100
15555 Biscayne Blvd.
Miami, Florida  33161

Miami Beach District Court (24)
Room 224
1130 Washington Avenue
Miami Beach, Florida  33139

Coral Gables District Court (25)
2801 Salzedo Street
Coral Gables, Florida  33134

South Dade Government Center (26)
10710 S.W. 211 Street
Miami, Florida  33189

Homestead District Court (27)
715 N.E. 1 Road
Homestead, Florida  33030

Sweetwater Branch Office
500 S.W. 109th Avenue
Sweetwater, Florida  33174